jyjETERS, J.
This medical malpractice action involves a medical misdiagnosis that allegedly resulted in the loss of Joshua N. Cone’s left testicle. The incident giving rise to the litigation occurred when Joshua was twelve years old. Joshua’s mother, Mary F. Vorndam, filed the original suit for damages on his behalf,[1] naming as defendants Dr. Steven Guillory, the physician responsible for the misdiagnosis of Joshua’s medical condition, and National Emergency Services, Inc. (NES), the company which placed Dr. Guillory at the emergency room in question. A jury trial resulted in a $5,500,000.00 verdict' in favor of Joshua and- against the defendants, with Dr. Guillory being assigned ninety percent of the fault and NES being assigned the remaining ten percent. Dr. Guillory has appealed, asserting five assignments of error.[2]
J^DISCUSSION OF THE RECORD
Joshua N. Cone was born on March 30, 1979, with an undescended testicle on the right side. This physical problem was *116 first addressed on May 21, 1979, by Dr. Lee Gary Ensley, a Decatur, Illinois urologist. Dr. Ensley took no action at that time, hoping that the testicle would descend naturally. He next saw Joshua on April 11,1980, at which time he thought he could feel the testicle high in the inguinal canal.[3] However, a year later, on April 13, 1981, Dr. Ensley could not palpate the testicle and decided to perform exploratory surgery. It was Dr. Ensley’s hope that he could locate the testicle and, if it were in the appropriate location and sufficient anatomically, bring it down into the scrotum. That was not to be the case. He performed the surgery in July of 1981, and the testicle was removed. Thus, Joshua began life with only one functioning testicle.
Over' the next ten years, Joshua experienced pain in the abdomen and groin which would occur and subside. The episode giving rise to this litigation began on Sunday, November 24, 1991, when Joshua began feeling sick and vomited. His mother assumed that he had the flu and sent him to bed. By 6:00 or 6:30 p.m., Joshua was not feeling better, so his stepfather, Rodney Neal Vorndam, a staff sergeant and laboratory technician at Fort Polk, Louisiana, decided to go to work as scheduled and check the Bayne-Jones Army Community Hospital Emergency Room at Fort Polk to determine how crowded it was.
At approximately 2:45 a.m. on November 25, 1991, Joshua arrived at the emergency room and was seen by Dr. Guillory, the emergency room physician. Dr. Guil-lory is a civilian but was working at the military hospital on assignment by NES, |3a company with which the Army had contracted to provide physicians to staff the hospital emergency room. Dr. Guillo-ry testified that the history provided was that Joshua began having abdominal pain in his lower left side sometime Sunday. During the examination, he discovered that Joshua was missing one testicle. After Dr. Guillory determined the pain was related to the remaining testicle, Joshua allowed him to touch it, but not to manipulate it due to the pain.
Upon completion of his examination, Dr. Guillory requested that the hospital staff contact the on-call urologist. According to Dr. Guillory, he was told that the on-call urologist was unavailable. He then asked for the on-call surgeon, who was also unavailable. Still concerned that he needed a urologist to help evaluate Joshua’s condition, he personally made calls to regional hospitals in an attempt to find a urologist but was unsuccessful. However, despite his obvious feeling that a urology consultation was necessary, Dr. Guillory never told Joshua or his parents of the immediate need for a specialist, nor did he advise them that he was looking for one who was unavailable.
Dr. Guillory testified that the only two significant diagnoses available, given his limited examination, were epididymitis[4] and torsion of the testicle.[5] He never attempted to detorse the testicle manually and, absent a urology consultation, opted to pursue treatment for epididymi-tis. When questioned concerning his instructions to Joshua’s parents, Dr. Guillo-ry indicated that he “[m]ay have” told the parents that they needed to return immediately the next morning to see the urologist, but he could Rnot testify to a certainty that he did so. Dr. Guillory *117 prescribed antibiotics and pain medication. Joshua was given a dose of each at the emergency room. However, he was not required to remain at the hospital while the pain medication was taking effect, which would have allowed Dr. Guillory to further examine the testicle and possibly detorse it. Instead, Joshua was released to go home.
On the next day, November 26, 1991, Joshua saw Dr. Thomas P. Alderson, a Lake Charles, Louisiana urologist, who examined him and transferred him to St. Patrick’s Hospital, where he underwent a testicular scan on the same day. The scan revealed an obstruction of the blood flow to the testicle, and based on his examination and the scan, Dr. Alderson diagnosed Joshua with testicular torsion. Dr. Aider-son immediately performed surgery on Joshua at St. Patrick’s Hospital. During surgery, Dr. Alderson observed that the testicle was torsed 120 degrees.[6] When Dr. Alderson detorsed the testicle during the surgery, it regained color, indicating blood flow. Dr. Alderson did not find any signs of epididymitis. He released Joshua to go home that evening.
Dr. Alderson next saw Joshua on December 2, 1991. The examination on that day revealed that the suture line of the surgery was healing well but the testicle was still swollen. Dr. Alderson testified that the testicle appeared to be blanching and appeared to be a good testicle. Nothing in this follow-up visit concerned Dr. Alderson.
On January 6, 1992, Dr. Alderson again saw Joshua. The examination on that day revealed that the incision had healed and the testicle was “situated nicely in the hemi scrotum, normal size, shape and position.” Dr. Alderson stated, “It looked like | fiit was going to be a testicle that was going to survive the insult,” and he released Joshua to return to his normal activities.
Dr. Alderson next saw Joshua on April 27, 1992. At that time, he noted that the testicle was “small and atrophic.” Based upon the results of a serum testosterone level test performed on Joshua, Dr. Aider-son concluded that the testicle was not producing testosterone and was no longer viable. He then referred Joshua to an endocrinologist for follow-up of his condition.[7] On November 23, 1992, Mrs. Vorn-dam filed the instant suit on behalf of Joshua.
For the next few years, Joshua was treated by various physicians around the country while following his stepfather in his military career. At the time of trial, he was under the care of Dr. Patricia Ann Powers, a San Antonio, Texas pediatric endocrinologist. Dr. Powers first saw Joshua on July 31, 1996. At that time, Joshua was receiving 200 milligrams of testosterone per month, and he and his stepfather told her that he was receiving testosterone replacement therapy for hy-pogonadism.[8]
Dr. Powers was informed by Joshua and his stepfather that he was now acquiring more body hair and musculature, was growing taller, and was experiencing phallus enlargement and some erections. She ordered blood tests and, after reviewing the results, recommended that Joshua increase the frequency of the injections and return in six months for a follow-up visit. The doctor explained that testosterone replacement therapy begins with a low dose to mimic the way normal puberty causes the slow increase of testosterone levels. Normally, the testosterone is initially administered once per month beginning with 50 milligrams. After six to twelve 16months, the monthly dosage is increased to 100 milligrams. Then, six to twelve *118 months later it is increased to 200 milligrams. Thereafter, the frequency of the injections is increased first to every three weeks and then to every two weeks. She further explained that testosterone is important to the male sexual function; the ability to have erections; and the development of body hair, muscle mass, and bone density. Joshua needs testosterone replacement therapy because he does not have the testicles to produce it for his body. Dr. Powers explained that there is also an interrelationship between testosterone and other hormones.
The blood test results did not change Dr. Powers’ opinion concerning the management of Joshua’s case. She recommended that he increase the frequency of the injections and return for a follow-up in six months. She suggested that in the future he might increase the dosage slightly but indicated that probably it would remain the same. However, she felt that the frequency would change. She recommended that he see an endocrinologist every six months for the remainder of his life.
Additionally, Joshua presented specific testimony regarding the physical and mental ramifications of this injury. However, we will reserve recitation of this evidence for discussion of the law pertaining to general damages.
After presentation of the evidence, the jury returned a verdict in Joshua’s favor and against Dr. Guillory and NES in the amount of $5,500,000.00. In answering the interrogatories propounded to it, the jury found that Dr. Guillory was ninety percent at fault in causing Joshua’s injury and assigned the remaining ten percent to NES. The jury rejected the defendants’ argument that either the Bayne-Jones Army 17Community Hospital or Mrs. Vorn-dam was at fault in causing Joshua’s injury.[9]
OPINION
On appeal, Dr. Guillory asserts five assignments of error: (1) that the trial court erred in denying his motion for a judgment notwithstanding the verdict (JNOV) and in maintaining a manifestly erroneous jury verdict regarding causation; (2) that the trial court erred in denying his motion for a JNOV and failing to grant a remittitur of the manifestly erroneous and excessive general damages award; (3) that the jury committed manifest error by finding no fault on the part of Mrs. Vorndam; (4) that the trial court erred in introducing hearsay evidence; and (5) that the jury committed manifest error in finding that he breached the 'standard of care as defined in La.R.S. 9:2794(A)i

Assignments of Error Numbers One and Five

In a medical malpractice action, the plaintiffs burden is to prove by a preponderance of the evidence the three elements set forth in La.R.S. 9:2794(A):
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or local and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
*119 (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
| ¡¡These elements raise issues to be determined by the trier of fact, which are subject to a manifest error analysis. Martin v. East Jefferson Gen. Hosp., 582 So.2d 1272 (La.1991). Additionally, the denial of a JNOV is also reviewed under the manifest error analysis. Gibson v. Bossier City Gen. Hosp., 594 So.2d 1332 (La.App. 2 Cir.1991). Because the first and fifth assignments of error relate to the proof of these three elements, they will be considered together.

Standard of Care

The evidence concerning the standard of care required of an emergency room physician was provided by Dr. John Errol McMillan, a DeRidder, Louisiana emergency medical physician, and Dr. Markus L. Pittman III, a Covington, Louisiana family practitioner who had worked as an emergency medical physician through 1994 or 1995. Dr. McMillan testified on behalf of Joshua, and Dr. Pittman testified on behalf of Dr. Guillory.
Dr. McMillan testified that Dr. Guillory breached the applicable standard of care by not pursuing the more serious of the two possible diagnoses, i.e., torsion of the testicle. He explained, “[T]he torsion is a surgical emergency because you have a limited window of opportunity to correct the situation so it is a surgical emergency and it must be — the top priority in the sense of diagnosis and treatment and getting proper surgical consultation, which is a urologist.” In other words, failure to properly treat the torsed testicle within a limited period of time would cause the loss of the testicle. Treatment of an infection should have been secondary until the possibility of testicular torsion was eliminated. Dr. McMillan testified that Joshua’s expressed discomfort during Dr. Guillory’s examination further indicated the importance of | flconsidering a torsed testicle as the first priority diagnosis. He further emphasized that the standard of care required Dr. Guillory to have ordered additional tests and to have immediately obtained the expertise of a urologist.
Dr. Guillory does not seriously dispute that he erred in his diagnosis or that he failed to inform the parents of the possible ramifications of testicular torsion. Further, he admits he did not tell the parents that time was essential in treating testicular torsion, “because the diagnosis at the time was probably epididymitis.” In defense of his actions, he stated that, according to military rules, he could not order secondary tests or make arrangements for transportation to another facility. Additionally, he claimed that a federal law prohibited him from advising the parents to go to Alexandria or Lake Charles as soon as possible to see a urologist. However, Dr. Guillory did not present any evidence of these policies or regulations other than his own testimony. Neither the jury nor the trial court found these excuses based on vague notions of legal limitations credible, nor do we. ■
Dr. Pittman testified that Dr. Guillory did not breach the standard of care required of emergency room physicians. However, he based this opinion strictly on the supposition that when Dr. Guillory was presented with Joshua’s complaints, the testicle was already dead. In other words, because it was dead, Dr. Guillory did nothing to harm Joshua. However, this rationale does not address the issue of standard of care, but rather causation. Therefore, we are left only with the testimony of Dr. McMillan concerning standard of care, and we find no manifest error in the jury’s conclusion that the defendant breached the standard of care required of an emergency room physician.

Causation

LoWhile conceding that he incorrectly diagnosed Joshua’s condition, Dr. Guillory argues that any misdiagnosis on his part was not the proximate cause of the *120 loss of the testicle because it was irretrievably lost when Joshua arrived at the Bayne-Jones emergency room. His argument is based on the expert testimony suggesting that a full torsion completely interrupts the blood supply to the testicle, and the window of opportunity for treatment is extremely short, usually four to six hours. If not treated within this time period, the interrupted blood supply will cause permanent loss of function of the testicle. Consequently, Dr. Guillory’s causation defense relies on his in-court assertion that Joshua suffered from a full testicular torsion before he arrived at the Bayne-Jones emergency room. The expert testimony presented established that the lesser the degree of torsion, the longer the window of opportunity for correction.
Pursuing the theory that the spermatic cord was torsed when Joshua’s pain began, evidence establishing when the pain began became important. The testimony was in conflict as to when the actual pain began. Mrs. Vorndam testified that Joshua awoke from an afternoon nap on Sunday, November 24, 1991, and initially complained of a stomach ache. He later began vomiting, and she sent him to bed, applying a cold rag to his head. According to Mrs. Vorn-dam, when she took him to the emergency room on the morning of the 25th, Joshua was too sick to walk and was escorted directly to an examination room. After returning from the emergency room, Joshua slept the remainder of the day. However, when he still could not walk normally on Tuesday, she called Dr. Alderson, who examined him that afternoon.
Dr. Guillory testified that Joshua told him that the pain woke him up on Sunday morning, but Dr. Guillory did not ask Joshua to recall the specific time. In any event, the time period between the manifestation of symptoms and examination was at least | n eight to nine hours.[10] Thus, had Joshua suffered a full torsion of the testicle at the onset of symptoms, the testicle would have already been unsalvageable by the time he arrived at the emergency room.
We find the evidence contrary to Dr. Guillory’s assertion that Joshua suffered a full torsion on Sunday before he examined him early Monday morning. Dr. Alder-son’s surgical procedure revealed that Joshua’s testicle was torsed 120 degrees. He compared this to a full torsion of 540 degrees. Dr. Alderson testified that normally he would attempt to manually relieve the torsion to preserve a portion of the window of opportunity during preparation for surgery.
In answering opposing counsel’s questions regarding his treatment policy, Dr. Alderson indicated that if Joshua had suffered a full torsion when he initially arrived, he would have performed manual manipulation. It is Dr. Guillory’s position that this last statement by Dr. Alderson supports his contention that Joshua had suffered from irreversible full testicular torsion. Based on that statement, Dr. Guillory reasons that, because Joshua sustained a full torsion, any misdiagnosis on his part was not the proximate cause of the injury suffered by Joshua. In other words, by the time he presented himself to the emergency room, the damage had been done. Evidently, the jury rejected the assertion that Joshua had a full torsion by the time he first saw Dr. Guillory, and this finding of fact is supported by the evidence in the record and is not clearly wrong. Furthermore, there exists more than adequate evidence to suggest that the jury could have found that when Dr. Alderson made the statement upon which Dr. Guillo-ry relies for this assertion, Dr. Alderson did not understand that the questions were posed in the specific context of Joshua’s treatment.
hiJn fact, had Joshua suffered from a full torsion, Dr. Alderson’s manual manip *121 ulation would have had to relieve 420 degrees of torsion (one and one-sixth rotations of the testicle) in order to reduce the torsion to 120 degrees. When Dr. Aider-son testified, he relied solely upon his records, having no independent recollection of the case. His records do not contain a notation that he manually manipulated the torsed testicle, and he did not-testify that he performed such an extreme manipulation in this case.
Also, Joshua’s level of pain at the time he saw Dr. Guillory indicates his testicle was not torsed a full 540 degrees. The most telling testimony on this point is that of Dr. Pittman, Dr. Guillory’s own expert, who testified that when the testicle has died as a result of a complete torsion, the patient will not feel pain. Yet, Joshua’s parents testified that they took him to Dr. Alderson because of the continued pain. Dr. Alderson testified that when he first observed Joshua, he noticed his “painful gait.”
Given this evidence, we find the trial court did not err in denying Dr. Guillory’s motion for a JNOV on the question of causation, and we further find no manifest error in the jury’s determination that Dr. Guillory breached the standard of care required of an emergency room physician as set forth in La.R.S. 9:2794(A). Thus, we reject Dr. Guillory’s first and fifth assignments of error.

Assignment of Error Number Three

In this assignment, Dr. Guillory asserts that the jury erred in finding no fault on the part of Mrs. Vorndam. This entire argument is based on the assumption that Joshua sustained a full torsion on Sunday afternoon. Having concluded that there is no evidence that Joshua sustained a full torsion, we find no error in the jury’s 113conclusion that Mrs. Vorndam was without fault in causing her son’s injuries.

Assignment of Error Number Four

In this assignment, Dr. Guillory contends that the trial court erred in allowing the introduction of Plaintiffs Exhibit 6 because the exhibit constitutes hearsay evidence. Plaintiffs Exhibit 6 is a letter dated March 19, 1990, to Dr. Guillo-ry from Dr. Juan Blanch, the emergency room medical director at Abbeville General Hospital. The purpose of the letter was to inform Dr. Guillory that he was “the subject of skewed perceptions.” The letter hinted of complaints of Dr. Guillory’s inability to communicate information to some of his patients. Additionally, the letter appears to be critical of Dr. Guillory’s personal activities, but specifically stated that “no one complains about your medical care (it would take a lot of nerve on then-part to do so).”
Dr. Guillory asserts that the trial court admitted the letter into evidence under the business-records exception to the hearsay rule. However, the record indicates the trial court found that the letter was admissible “to show state of mind” of NES. Assuming that the letter constitutes an exception to the hearsay rule, it must still pass the relevancy test under La.Code Evid. art. 402, which provides in part that “[ejvidence which is not relevant is not admissible.”
The letter at issue expressly does not question Dr. Guillory’s medical care but questions only his personal practices and communication skills. These are not issues in the instant case. Rather, Dr. Guil-lory’s medical care is at issue. Therefore, the letter is not relevant and thus should not have been admitted.
“Error has been defined as harmless when it is ‘trivial, formal, merely academic, and not prejudicial to the substantial rights of the party assigning it, and | uwhere it in no way affects the final outcome of the case.’ 5 Am.Jur.2d, Appeal and Error § 776 (1962).” Buckbee v. United, Gas Pipe Line Co. Inc., 561 So.2d 76, 85 (La.1990) (citations omitted). We find that the admission of the letter was harmless error, particularly since it is clear that Dr. Guillory’s treatment of Joshua fell below the standard of care and *122 since the only substantial liability issue is causation.

Assignment of Error Number Two

In this assignment, Dr. Guillory argues that the trial court erred in denying his motion for a JNOV and in failing to grant a remittitur of the manifestly erroneous and excessive general damages award. The jury awarded Joshua $5,500,-000.00, which represents the entire general damages award.
The standard for appellate review of a trial court’s award was set forth by the Louisiana Supreme Court in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994):
[T]he discretion vested in the trier of fact is “great,” and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Further, the supreme court clarified this standard in Andrus v. State Farm Mutual Automobile Insurance Co., 95-0801, pp. 8-9 (La.3/22/96); 670 So.2d 1206, 1210: “The threshold determination by either the court of appeal or this court is whether the amounts awarded by the trial court constituted an abuse of discretion, in either direction. The standard for that is both difficult to express and difficult to apply.”
Dr. Guillory argues forcefully that Joshua has suffered little or no injury. In his brief, he states, “Mr. Cone was a healthy, well developed and well nourished jámale.... [I]t is ‘more probable than not’ he will have a normal sex life and should have no problem with erections. Other than infertility, he has no physical disabilities whatsoever and functions as a normal human being.” (Emphasis added). Such an argument attempts to de-empha-size the importance which should be placed upon the natural right and God-given privilege to procreate. Additionally, we note that Joshua’s development as a man is based entirely on periodic injections necessitated by Dr. Guillory’s fault, and we cannot agree that Joshua will have a “normal sex life,” given his condition.
Cases with injuries such as the one suffered by Joshua are not those which a trier of fact decides on a regular basis. In Felice v. Valleylab, Inc., 520 So.2d 920, 930 (La.App. 3 Cir.1987), writ denied, 522 So.2d 562 (La.1988), a young boy’s penis was burned off by an electrosurgical device during a circumcision operation, and this court made the following comment concerning assessment of general damages:
The usual guidelines — pain and suffering, disability, loss of income, future medicals — are inappropriate to measure this loss. Pain, the doctors say, although intense at first, is now gone. Future medical treatment and expenses could be enormous, but no one knows for sure. The urination function is accommodated by a still-working, albeit shorter, urethra. As a physical person who can eat, drink, sleep, work, think, [this boy] probably can meet objective standards for normal performance.
It is elsewhere that his loss lies. Sexual pleasure, procreativity, marriage in any normal sense, these things will never exist for him. The suffering of deprivation, both physical and mental, that will accompany him throughout his life can be only vaguely imagined.
Even though Joshua’s injury is somewhat different from that of the plaintiff in Felice, his losses are basically the same. The loss of his only remaining testicle could not have happened at a more inopportune time. Joshua was twelve years old and only beginning to develop as a man. The loss of the testicle prevented him from naturally | ^developing adult *123 male characteristics and caused him to be the brunt of cruel comments from his peers.
The most articulate spokesman on the issue of his damages was Joshua himself who justified the jury’s award by offering riveting testimony on the effect Dr. Guillo-ry’s actions had on his life. By the time this matter was tried, Joshua was eighteen years old, was living in San Antonio, Texas, and had recently graduated from high school. In the fall, he planned to enroll at Southwest Texas State in San Marcos, Texas, and major in English. He did not have an independent recollection of the events of November 1991, but he was keenly aware of his condition and went to great lengths to keep his condition secret. As to his involvement in gym class, he stated:
I was very careful about who was around when I changed clothes and if there were people around, I judged the shirt length — how long it was before I changed clothes. If the shirt length wasn’t long enough, then I would just— you know, find some place else to go change clothes. If the shirt length was long enough, then I would change my pants first and then change the shirt.
Even in high school, as a member of the band, he was very careful when dressing out. Despite his best efforts, other students became aware of his condition and their reaction to him caused him humiliation and anguish.
Despite his condition, Joshua pursued his future to the best of his ability and within his limitations. He worked at Shone/s Restaurant and BlockBuster Video while in high school and was apparently highly appreciated by his employers in each case. Still, his life’s goals were destroyed by his injury. He stated:
There was a time when I wanted to go into the Air Force and be a fighter pilot. That was just the coolest thing in the world to me; that’s what I wanted to do with my life. I wanted to go fly an F-16 for the Air Force. That was my dream, flying this million dollar plane that I don’t have to pay for and just being able to have a good time up in the sky and |17not really worry about anything. Due to the medication that I am now on, I can not join any branch of the military service. So, I am now attending college as a settlement. I’m settling for my second best, which is fíne, I’ll make a success out of it.
At the time of trial, the testosterone injection dosage had stabilized at 200 milligrams, but the frequency of injection had risen to once every two weeks. Joshua will require these injections for the remainder of his life. This vivid description of the injection procedure was supplied by Joshua:
' Testosterone is like — I don’t know any other way to describe it than thick maple syrup. It’s in a jar, my dad pulls it out with a syringe and it takes a while— he uses a bigger needle to pull it out of the jar than he does to put it in me, thank heaven. He pulls it out of the jar, changes the needles, and he preps the area where he’s going to give it, you know, sterilizes it with alcohol pads or whatever, pushes the needle into my hip which is as we all know, is not a comfortable feeling, and then proceeds to inject the medication which takes a considerable bit of time because the needle that he’s using is so small and the medicine is so thick.
As to his attitude toward future treatment, Joshua testified:
It’s hard not to think about that. You have a doctor telling you, you will come back at least once a year which isn’t that big a deal, you should go see your doctor. But to go see a specific doctor about a specific problem, you know, the same problem that you’ve had year after year after year. Nothing that doctor is going to tell you is going to change the problem that you have. When I go back to Dr. Powers, or whoever, five or ten years from now, they’re not going to tell *124 me, oh, we can heal you. They can’t tell me that. I will be on medication for the rest of my life; that will be painful. It’s not something I’m looking forward to.
As to the loss of his ability to father a child, this articulate eighteen-year-old gave the following testimony to the trial court:
As you all have heard time and time again, I can not father my own children; that’s important to me. There is adoption; there is artificial insemination and that’s all fine. I will never be able to look a child in the eye and say, that child is a part of me. I gave that child life; that child has my blood. Any adopted child, yes, I can give the child my values; I can give the child my beliefs and teach them the ways that I think are right. But I can not look at that child and just see myself. My parents will'not be able to look at that child and say, that is my II «grandchild, I had a part in that. That’s important to me, not just for me but for my mom and my biological father. I mean, I know it’s important to them. They can’t see that now. Also, from a spouse prospective [sic], I have to deal with the fact that anyone that I want to possibly look at as a wife, before I get down on my knee, I have to look her in the eye and say, listen, I can’t give you a child; I can not give you a family and no matter how much that person loves me or I love that person, that’s a big thing for anybody. I mean, and she may say, yeah, that’s fine, that’s okay, we can adopt or whatever. But I can’t just marry her and say, by the way, we can’t have kids. That’s something else I have to look at.
In relation to adopting children, Joshua stated:
I’ve given my parents quite a burden. There are, of course, the legal fees and I haven’t actually gone to an adoption agency and looked into all the costs but legal fees alone will eat me alive. The adoption agency has to be paid; you have to wait so long for them to find a child — you know, for you to adopt and then there’s the risk of adopting a child that just — I don’t want to say is a bad kid because I don’t think there is a bad kid. It’s all in how you raise them but sometimes the genes don’t mesh so that’s another problem I can encounter.
As expressed in Felice, a jury of twelve persons using common sense has reached a figure of $5,500,000.00. The jury had the opportunity to evaluate all the evidence on damages and reached the conclusion, in its vast discretion, that Joshua was entitled to this amount. We do not find that the jury abused its vast discretion in reaching this conclusion, nor do we find that the trial court erred in denying Dr. Guillory’s motion for a JNOV and failing to grant a remittitur. Thus, we find that this assignment of error has no merit.
DISPOSITION
For the foregoing reasons, the judgment of the trial court is affirmed in all respects. All costs of this appeal are taxed against Dr. Guillory.
AFFIRMED.

. By the time of trial, Joshua appeared on his own behalf.

. NES also appealed, but during the pen-dency of the appeal, Joshua’s claims against NES were settled.

. The inguinal canal is a tubular opening through the lower part of the anterior abdominal wall which, in males, contains the sper-matic cord.

. Epididymitis is an inflammation of the epi-didymis, which consists of the tubules which convey spermatozoa from the testes to the vas deferens.

.Torsion, of the testicle is a condition in which the spermatic cord is twisted. Any twisting of the spermatic cord results in a restriction of blood flow to the testicle. The greater the degree of torsion, the less blood flows to the testicle.

. The doctor testified that a full torsion is approximately 540 degrees.

. Endocrinology is the study of ductless glands and their secretions.

.Dr. Powers testified that hypogonadism is that state in which the gonads, or testes in a male, are functioning abnormally or are not functioning at all.

. In their original answers, both NES and Dr. Guillory asserted as a defense the comparative negligence of the hospital, Mr. Vorndam, and/or Mrs. Vorndam. Additionally, both de-fendanls filed third-parly demands against Mrs. Vorndam, seeking indemnification for any damages with which they might be assessed.

. Joshua was complaining of stomach pain when his stepfather left for work at approximately 6:00 p.m. on the 24th, and he arrived at the emergency room at approximately 2:45 a.m. on the 25th.