747 So.2d 1085 (1999)
Joshua N. CONE et al.
v.
NATIONAL EMERGENCY SERVICES, INC. et al.
No. 99-C-0934.
Supreme Court of Louisiana.
October 29, 1999.
*1086 Brian D. Cespiva, Gravel, Cespiva & Wilkerson, Alexandria, Counsel for Applicant.
Leslie R. Leavoy, Jr., Martha A. O'Neal, Wallace & O'Neal, De Ridder, Nora T. Bolling, John E. Galloway, Galloway, Johnson, Tompkins & Burr, New Orleans, Counsel for Respondent.
LEMMON, Justice.[*]
In this medical malpractice action based on the failure of an emergency room physician to properly diagnose and treat torsion of the testicle of a twelve-year old boy, allegedly causing the loss of viability of the boy's only testicle, the jury awarded damages of $5,500,000. The principal issues in this court involve (1) the causative relationship between the doctor's malpractice and the damages suffered by the boy and (2) the excessiveness of the damage award.

Facts
Plaintiff,[1] Joshua N. Cone, was born with an undescended testicle on the right side. This testicle was removed when plaintiff was two years old. Over the next ten years, plaintiff sporadically suffered from pain in the abdomen and groin.
On a Sunday afternoon in November 1991, plaintiff, who was twelve years old at the time, complained of abdominal and groin pain that caused vomiting. Suspecting he had influenza, his mother put him to bed. Plaintiffs stepfather, who worked the night shift at Bayne-Jones Army Community Hospital in Leesville, went to work about 6:30 p.m., planning to check on the boy by telephone and to have him examined, if necessary, in the hospital emergency room. When plaintiffs condition did not improve, his mother drove him to the emergency room at 2:45 a.m. on Monday morning.
At the hospital, plaintiff was examined by Dr. Dick Steven Guillory, a civilian contract physician assigned to work at the army hospital by National Emergency Services (NES). Dr. Guillory noted that plaintiff had only one testicle and that the remaining testicle was normal or slightly enlarged. He diagnosed either epididymitis, an infection that causes inflammation of the tubules which carry sperm from the testes to the vas deferens component of the spermatic cord, or torsion of the testicle, a condition in which the twisted testicle twists the entire spermatic cord and may cut off its blood vessel component. Unable to contact a urologist or surgeon and without obtaining diagnostic testing, Dr. Guillory opted to treat plaintiff for epididymitis and prescribed antibiotics and pain medication. Although he provided the parents with a list of urologists to contact if pain persisted, he released plaintiff from the hospital without informing the parents of the possibility of torsion of the testicle or of the urgency of immediate attention for such a condition.
When plaintiff's pain continued the next morning, his mother contacted Dr. Thomas Alderson, a urologist in Lake Charles, and was advised to bring her son to him immediately. Plaintiff arrived at 1:00 p.m., and Dr. Alderson immediately obtained plaintiff's *1087 medical history and conducted a physical examination. He then ordered a testicular scan, from which he diagnosed a torsion of the testicle. At 6:07 p.m., Dr. Alderson performed an operation to correct the torsion, discovering that the cord of the testicle was twisted 120 degrees. When the doctor manipulated the testicle during surgery to relieve the torsion, he noticed blanching, indicating a blood flow to the testicle.
The next week, plaintiffs condition appeared to be satisfactory, and Dr. Alderson was confident the testicle would survive. Several months later, however, it became apparent to Dr. Alderson that the testicle was no longer viable.
This action followed, seeking damages for the medical malpractice that allegedly caused plaintiff to lose his only testicle. The petition further alleged negligence by NES in hiring Dr. Guillory.
The jury determined that Dr. Guillory and NES were both at fault in causing plaintiffs injuries and assessed ninety percent of the fault to Dr. Guillory and ten percent to NES. The jury awarded damages in the lump sum amount of $5,500,000.
The judgment was affirmed on appeal. 98-257 (La.App. 3d Cir.3/3/99), 737 So.2d 114. The court of appeal, accepting the testimony of the emergency medical expert presented by plaintiff,[2] determined that Dr. Guillory breached the applicable standard of care by failing to pursue the more serious of the two possible diagnoses, torsion of the testicle, a condition that requires immediate treatment and in which there is limited window of opportunity to act, depending on the degree of torsion of the testicle. On the causation issue, the court rejected defendants' contention that plaintiff had suffered a full torsion of the testicle (540 to 560 degreesa turn and a half or more) and that the testicle was already dead when plaintiff was examined by Dr. Guillory. The court concluded that the evidence supported the jury's conclusion that plaintiff did not suffer a full torsion, but rather suffered only a partial torsion which Dr. Guillory had sufficient time to correct if he had properly diagnosed and immediately treated the condition.
Finally, the court determined that the jury did not abuse its vast discretion in the award for the physical and mental pain and suffering, the disfigurement, the loss of the ability to produce children, the necessity of increased testosterone therapy, and the humiliation, anguish and other psychological effects of plaintiffs injury.
This court granted Dr. Guillory's application for certiorari to review the decisions of the lower courts on causation and quantum.[3] 99-0934 (La.5/28/99), 743 So.2d 654.

Causation
Dr. Guillory contends that any medical malpractice on his part was not a cause-in-fact of plaintiffs loss of viability because the harm to the testicle was already done at the time he examined plaintiff in the emergency room. Dr. Guillory asserts that even if he had correctly diagnosed and immediately treated the problem, the testicle could not have been saved because too much time had elapsed from the onset of the torsion.
Undisputed medical evidence established that the window of opportunity for treating a full torsion of the testicle is four to six hours. If the testicle is only partially twisted, however, the window of opportunity in which to save the testicle is increased because of the greater blood flow. Moreover, torsion is an acute event, and when a *1088 partial torsion occurs, it does not develop into a full torsion.
In the present case, the onset of plaintiff's pain, which is the indicator of torsion, occurred on Sunday afternoon between noon and 6:00 p.m., and his arrival at the emergency room at 2:45 a.m. on Monday was beyond the window of opportunity for saving his testicle if plaintiff had suffered a full torsion. On the other hand, a testicle with a partial torsion could still have been viable at that point. Thus, the causation issue turns on whether plaintiff suffered a full or a partial torsion of the testicle, because Dr. Guillory's negligence could not be a cause-in-fact of plaintiff's loss if plaintiff had suffered a full torsion of the testicle.
During surgery, Dr. Alderson determined that the torsion was 120 degrees, a partial torsion that would allow a more lengthy window of opportunity for treatment. However, defendant argues that Dr. Alderson, who stated that he normally "detorses" a patient's testicle manually in his office before obtaining a testicular scan, opined that plaintiff had a full torsion before being "detorsed" in the office. The record is confusing on this point, because the questions were primarily hypothetical. Significantly, Dr. Alderson did not record in his notes that he had found a full torsion in his office, even if he did manipulate the testicle manually prior to the surgery (which also was not recorded). Further, the surgery was performed at 6:07 p.m., over five hours after Dr. Alderson examined plaintiff in his office, and Dr. Alderson emphasized that he would not delay torsion surgery for five hours if he had determined significant torsion in an office examination. Moreover, nothing in Dr. Alderson's testimony in answer to direct questions remotely suggests that he believed he could have untwisted the testicle by manual manipulation in his office prior to surgery from 540 degrees to 120 degrees.
Moreover, testimony of the expert for the defense that a person will not be in pain if the testicle has already died as a result of a complete torsion actually supports a conclusion that plaintiff did not suffer a full torsion. Plaintiffs complaints in the emergency room included pain in the lower left groin and abdominal area. Dr. Guillory testified that although plaintiff allowed him to touch and feel the testicle, it "was very tender," and he could not perform a prolonged examination of the testicle. And plaintiff was still experiencing pain in the abdomen and groin area when Dr. Alderson examined him on Tuesday afternoon and noted his "painful looking gait." During surgery, Dr. Alderson noted a partial torsion of 120 degrees, and he untwisted the testicle and observed blanching, which indicated a good testicle rather than one that was already dead.
On the basis of this evidence, the jury could reasonably have concluded that the testicle was not dead and was still viable when Dr. Guillory examined plaintiff in the emergency room. If the doctor had correctly diagnosed and immediately treated the torsion in the emergency room, he would have afforded plaintiff the opportunity to have the testicle untwisted sooner and thus would have increased the likelihood that the testicle would survive. The malpractice prolonged the time period in which plaintiff suffered the partial torsion and greatly diminished the possibility of saving the testicle. As determined by the trier of fact, Dr. Guillory's medical malpractice was a cause-in-fact of plaintiffs loss.
Moreover, an expert emergency room physician presented by plaintiff testified that Dr. Guillory's failure to recommend definite testing or immediate urological consultation more probably than not caused plaintiff the loss of his testicle and that the delay resulted in injury "to the testicle pas[t] the point of recovery." Although Dr. Guillory challenged the basis for the expert's opinion, the record viewed in context supports this expert's opinion, which in turn supports the verdict of the jury on causation.

*1089 Amount of Damages

As a result of Dr. Guillory's malpractice, plaintiff lost his only remaining testicle and is permanently disfigured. The loss occurred as plaintiff was entering puberty, a critical developmental stage of his life. Although he was beginning to develop manly features,[4] the loss of the testicle caused this development to cease because his body was no longer producing testosterone, the hormone crucial to the development of secondary sex characteristics in a male. He receives painful testosterone replacement injections every two weeks,[5] must continue this replacement therapy for the rest of his life, and will be required to have semi-annual medical examinations to monitor his condition. Most significantly, plaintiff is now unable to produce children.
As a result of the disfigurement, plaintiff has endured teasing, taunting and ridicule from others. For most of his junior high and high school years, plaintiff was smaller than his peers and was not developing muscles or producing facial hair until well after he began the testosterone replacement. He was derided by his classmates, and the fear of continued teasing and taunting forced him to curtail normal adolescent sports activities. He opted for band instead of physical education so as to avoid changing his clothes in front of others. Even as a member of the band, he was very cautious when dressing out in order to avoid ridicule. It was not until he was eighteen years old, after six years of testosterone treatment, that he finally began developing normal male features. Although he was a college student at the time of trial, plaintiff still refused to live in a dormitory for fear of humiliation.
Plaintiff cannot pursue a military career to fulfill his lifetime ambition to become an Air Force pilot because the military will not accept anyone who is on a constant regime of medication. Furthermore, once plaintiff is no longer a military dependant, he likely will have difficulty securing adequate medical insurance to cover his condition.
In the present case, the appellate court concluded that the jury did not abuse its discretion in assessing the damage award. In reaching that conclusion, the appellate court compared Joshua's injuries to those of the plaintiff in Felice v. Valleylab, Inc., 520 So.2d 920, 930 (La.App. 3d Cir.1987), cert. denied, 522 So.2d 562 (La.1988).
Resorting to a comparison of prior awards is only appropriate after the reviewing court has concluded that an abuse of discretion has occurred. Reck v. Stevens, 373 So.2d 498 (La.1979). Thus, the initial inquiry for this court is whether the jury abused its discretion in assessing the amount of damages. Id. If the court concludes that it has, then and only then may the prior awards be used for determining the highest or lowest amount that was reasonably within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La. 1976).
The standard for appellate review for abuse of discretion in the award of general damages is difficult to express and is necessarily non-specific. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). In Youn, this court recognized that:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular *1090 circumstances that the appellate court should increase or reduce the award.[6]
In determining whether the jury abused its discretion in awarding general damages in the present case, we note that although plaintiff's injury was extreme and serious, his future medical treatment will not be extensive, and his future medical expenses will be relatively minimal. Moreover, there are no other physical or functional disabilities besides infertility and disfigurement, although these are extremely significant conditions. We conclude that the jury abused its discretion in awarding an excessive sum for the damages that were proved. This sum is not within the range that a reasonable trier of fact could have appropriately awarded to compensate this particular plaintiff for this particular injury under these particular circumstances, and the jury thus abused its discretion in this damage award.
Once the reviewing court has determined that the jury abused its discretion in awarding an excessive amount of general damages, the next step is to determine the highest amount that would not have constituted an abuse of discretion.[7] The standard for this determination is likewise difficult to express and is necessarily nonspecific.
The court of appeal likened plaintiff's losses to those of the plaintiff in Felice. However, while the damages suffered by the young boy in Felice were far greater than those sustained by this plaintiff, the general damages award in the present case is twice the award in Felice.[8] The only alternatives for the child in Felice were possible reconstructive surgery when he reached puberty or a sex change operation. In either case, the child would require extensive psychiatric counseling to help him cope with his loss. He also certainly could be expected to experience anger and frustration as he matures and most likely an adverse effect on his self-identity. He could never experience sexual pleasure, procreativity or marriage in a normal sense.
On the other hand, the tort victim in this case was not a normal twelve-year old after the injury, he did not experience a normal adolescence, and although he will be able to have erections and engage in sexual activities, one can hardly characterize sexual activity for him as normal. Because of his condition and the resulting inability to have children, he faces uncertainty and anxiety in courtship years that will culminate, as he described it, in having to divulge to the person he chooses for a spouse that they will not be able to have children of their own. His injury will certainly affect adversely his courtship years and his marital relationship.
While general damages can never be calculated with mathematical certainty, the ability to produce one's own children is a gift of inestimatable valueit is priceless. The malpractice deprived plaintiff of that ability, caused him bodily disfigurement, and ended his lifelong ambition to become an Air Force pilot. He also faces testosterone replacement therapy treatment and *1091 endocrinological evaluations for the rest of his life.
In summary, this injury severely affected plaintiffs childhood and adolescence and will continue to fill his future with much anxiety and uncertainty. Although plaintiff has coped well psychologically to this point and has down-played any emotional problems he may have suffered from his loss, his present ability to adapt well to his situation should not redound to his disadvantage in the assessment of his past and future damages.
There are few cases that involve injuries both of this severity and of this nature. In addition to Felice, which was decided twelve years ago, we refer to the eleven-year old case of Wisner v. Illinois Cent. Gulf R.R., 537 So.2d 740, 750 (La.App. 1st Cir.1988). There, the court of appeal affirmed a jury's award of $2,200,000 in general damages against the defendant in favor of a state trooper who was exposed to toxic chemicals while supervising a freight train derailment. The plaintiff suffered from a lung condition and exercise intolerance, severe depression, impotence, and loss of vision, and his pituitary gland and testicles were damaged. Although a penile implant would allow him to have an erection, it will not produce orgasm or create any pleasurable sensations. Based on this, the court concluded that a general damage award of $2,200,000 was not so excessive as to shock the conscience.
For the total damages for these particular injuries to this particular plaintiff under these particular circumstances, we deem the sum of $1,750,000 to be the highest amount within the range of discretion of the trier of fact.

Decree
The judgments of the lower courts are amended to reduce the award of damages to $1,750,000. As amended, the judgment is affirmed.
KNOLL, J., dissents in part for assigned reasons.
KIMBALL, J., dissents for reasons assigned by KNOLL, J.
KNOLL, Justice, dissenting in part.
I agree that the jury abused its discretion in awarding plaintiff $5,500,000. However, I disagree with the majority's conclusion that $1,750,000 is the highest amount reasonably within the range of discretion of the trier of fact. Accordingly, I respectfully dissent from the majority disturbing the quantum award to a low amount.
Before an appellate court can disturb the factfinder's award, the record must clearly reveal that the trier of fact abused it discretion in making the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Coco v. Winston Indus., Inc., 341 So.2d 332, 334 (La.1976). The task of the appellate court then, however, is not simply to determine what it believes to be the appropriate award based on the evidence. Coco, 341 So.2d at 335. Instead, the reviewing court is limited to disturbing the award only to the extent of lowering it (or raising it) to the highest (or lowest) point reasonably within the wide discretion afforded the factfinder. Id. (citations omitted). Further, while resorting to the awards in other cases is appropriate for the appellate court, such awards can only serve as an aid. Prior awards should not and cannot be used to provide uniformity of damages to all similar cases. Id. To hold otherwise materially weakens and fails to appreciate the respect reviewing courts owe the factfinder. Ultimately, the adequacy or inadequacy of any award can only be determined by a complete consideration of the facts and circumstances peculiar to each case.
Because of the defendant's negligence, the plaintiff sustained injury to his only remaining testicle, resulting in its removal, his sterility, and his diminished hormonal *1092 development as a man. This loss was especially significant to plaintiff as it occurred just as he was entering puberty and substantially interrupted and diminished his normal development. The jury's award of damages to Josh included damages for his permanent disfigurement, mental anguish, embarrassment, humiliation, and medical expenses. Although the majority concedes that the injury was traumatic, that Josh suffered and continues to suffer humiliation from peers, and that Josh suffered and will continue to suffer mental anguish in losing the opportunity to pursue his lifetime career and never having the opportunity to have children of his own, I believe that the majority fails to fully appreciate the extent of the psychological injuries this particular injury has had on this young man. The plaintiff suffered and will, unfortunately, continue to suffer emotional injuries incapable of exact mathematical calculation for the rest of his life. In every aspect of his social, work, and romantic relations, plaintiff must learn to face, deal with, and explain an aspect of life more personal than any other. Without argument, this tragic injury will forever negatively impact his self-esteem in every aspect of his life as he attempts to cope with life's crises as they occur.
Finally, I believe the majority fails to appreciate the obvious distinctions in Felice and Wisner and the individual circumstances of the case before us, making the substantial reduction in the jury's award incorrect. In Felice, a twelve-year-old case, a two-year-old child's penis was accidently burned off during a circumcision. 520 So.2d at 922. On appeal, the court affirmed the jury's award of $2,750,000 as the more reasonable total damage award and rejected the trial judge's award of $1,730,000. Id. at 930. While the injuries and resulting damages in Felice and the case sub judice are similar, noticeably absent from the child's award in Felice was the inability to have children. In the case sub judice, perhaps the single greatest loss plaintiff suffered and to which uncontradicted evidence was present was this loss. In Wisner, an eleven-year-old case, a thirty-five-year-old state trooper was awarded $2,794,000 in total damages after being exposed to toxic chemicals release from a train derailment. 537 So.2d at 743. The plaintiff's injuries included damage to his lungs, pituitary gland, and testicles, exercise intolerance, depression, impotence, and loss of vision. The award, however, did not include evidence of humiliation, teasing, taunting, ridicule for others, or loss of ability to have children. Further, there was no evidence as to the impact on his prospect of marital relations. Finally, the plaintiff was a fully grown man well into the prime of his life.
Considering the staleness of the quantum awards in Felice and Wisner, the jury's award in this case, the full extent of and the circumstances resulting from plaintiff's horrific injury, and the limitation of Youn, I cannot agree that $1,750,000 is lowering the abusive award to the highest point reasonably within the wide discretion afforded the factfinder. For these reason, I respectfully dissent.
NOTES
[*] Victory, J., not on panel. Rule IV, Part 2, § 3.
[1] While this opinion refers to the tort victim as plaintiff, suit was filed by Joshua Cone's mother individually and on behalf of her minor son. Upon his majority, Joshua Cone was recognized as a plaintiff.
[2] The expert family practitioner presented by defendant primarily discounted Dr. Guillory's responsibility based on his belief that immediate treatment by Dr. Guillory could not have prevented the loss of viability of the testicle, because it was already dead when plaintiff was presented to Dr. Guillory. This expert testimony, however, primarily addresses the causation issue, rather than the breach of duty issue.
[3] NES did not apply for certiorari.
[4] Specifically, plaintiff had begun to grow body hair and his voice had started to change.
[5] Although testosterone can be administered by placing a patch directly on the skin, this method is more costly than injections, and the patches are not readily available.
[6] See La. Civ.Code art. 1999: "When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages."
[7] Likewise, if the jury abuses its discretion and awards an amount that is too low to compensate the particular plaintiff, the reviewing court must raise that award to the lowest amount within the range that a reasonable trier of fact could ascertain is appropriate to compensate that plaintiff.
[8] In Felice, the penis of a two-year old boy was completely burned off as a result of a failed circumcision involving an electrosurgical device. The young boy continually complained of pain for over two weeks and suffered greatly as the tissue of his penis withered away. Nothing could be done to save the tissue; in the end, he had no visible penis left. He also had physical problems with his urethra and had four additional surgeries. The jury determined that $2,750,000 was an appropriate damage award, and the court of appeal concluded there was no abuse of discretion.