STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

**2022 CA 0534**

GERALD WAYNE GLASER, INDIVIDUALLY AND AS EXECUTOR OF THE
ESTATE OF CHARLES RAYMOND GLASER, SR., TRUDY GLASER, AND
ROBERT GLASER

VERSUS

HARTFORD FIRE INSURANCE COMPANY, STEVEN RAY COWART, RAIL
1, LLC, AND STATE OF LOUISIANA THROUGH THE LOUISIANA
DEPARTMENT OF TRANSPORTATION

*---CONSOLIDATED WITH---*

**2022 CA 0535**

DANNA J. GLASER, INDIVIDUALLY AND AS THE EXECUTOR OF THE
ESTATE OF CHARLES RAYMOND GLASER, SR., BARBARA G.
LACOMBE, AND CHARLES R. GLASER, JR.

VERSUS

HARTFORD FIRE INSURANCE COMPANY, STEVEN RAY COWART, RAIL
1, LLC, AND STATE OF LOUISIANA THROUGH THE LOUISIANA
DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT

JUDGMENT RENDERED: **AUG 3 0 2023**

* * * * * * *

Appealed from the Eighteenth Judicial District Court
Parish of Pointe Coupee • State of Louisiana
Docket Number 49,803 c/w Docket Number 50,012-A • Division "C"

The Honorable Alvin Batiste, Jr., Presiding Judge

* * * * * * *

Julie E. Vaicius
Daniel E. Atkinson, Jr.
Metairie, Louisiana
*and*
H. Alston Johnson, III
Kevin W. Welsh
Baton Rouge, Louisiana

COUNSEL FOR APPELLANTS
DEFENDANTS—Steven Ray Cowart;
Rail 1, LLC; Hartford Fire Insurance
Company; and Hartford Casualty
Insurance Company

GREENE, J. dissents with reasons.

Welch, J. concurs in part and dissents in part and assigns reasons.

Amira A. Makke
Robert M. Marionneaux, Jr.
B. Cade Melancon
Baton Rouge, Louisiana

COUNSEL FOR APPELLEES
PLAINTIFFS—Gerald Wayne Glaser,
individually and as Executor of the
Estate of Charles Raymond Glaser,
Sr.; Trudy Glaser; Robert Glaser; and
Karl Glaser


Donald J. Cazayoux, Jr.
J. Lane Ewing, Jr.
Baton Rouge, Louisiana

COUNSEL FOR APPELLEES
PLAINTIFFS—Danna J. Glaser,
individually and as Executor of the
Estate of Charles Raymond Glaser,
Sr.; Barbara G Lacombe; and Charles
R. Glaser, Jr.

* * * * * * *

BEFORE: WELCH, THERIOT, PENZATO, LANIER, AND GREENE, JJ.

**PENZATO, J.**

The defendants—Steven Ray Cowart, Rail 1, LLC ("Rail 1"), Hartford Fire Insurance Company, and Hartford Casualty Insurance Company—challenge the general compensatory damages awarded for survival and wrongful death actions by the trial court pursuant to a jury verdict. The plaintiffs—decedent's seven adult children—have answered the defendants' appeal, seeking reversals of: the jury's 20% fault allocation to decedent; the trial court's denial of their motions for judgment notwithstanding the verdict ("JNOV"), or alternatively, motions for new trial; and a motion *in limine* granted in favor of Rail 1, prohibiting the introduction of any evidence regarding Rail 1's direct negligence.

For the reasons that follow, we reverse the trial court's denial of defendants' JNOV as to the amounts of the survival damage award and wrongful death awards; we render JNOV, awarding plaintiffs $2 million in survival damages and $500,000 each in wrongful death damages (totaling $3.5 million). We grant plaintiffs' answers to the appeal. We reverse the trial court's denial of plaintiffs' JNOV; we render JNOV, finding defendants Steven Ray Cowart/Rail 1 100% at fault for the automobile collision.

## BACKGROUND

On May 13, 2020, at approximately 9:49 a.m., three employees of Rail 1 were operating tractor-trailers pulled by semi-trucks and traveling in a caravan on US Highway 190 West, just west of the Town of Lottie, Louisiana, headed to a location near Fordoche, to deliver equipment to a Union Pacific Railroad facility. At this location, Highway 190 is a divided, four-lane highway with a posted speed limit of 55-miles-per-hour. The eastbound and westbound lanes are separated by a guardrail. Driver Shaye Stanford led the Rail 1 caravan, followed by drivers Steven Ray Cowart and Michael Cleypas.

3

Around the same time, Gerald Wayne Glaser, Sr. was also traveling on Highway 190 West in a 2012 white Ford F-150 pickup truck, some distance behind the Rail 1 caravan.

After passing through the Town of Lottie, the Rail 1 drivers realized they had missed a turn. The drivers pulled onto the north shoulder of Highway 190 West, with the intention of using an opening in the guardrail to make a left U-turn. The drivers agreed to "spot" for each other by watching for oncoming traffic and communicating via CB radio or hands-free cell phones. To have enough room to make the left U-turn, the drivers pulled off the shoulder and into the parking lot of an abandoned building.

After Ms. Stanford successfully completed her left U-turn, she pulled onto the south shoulder of Highway 190 East to spot for the other two drivers. Mr. Cowart moved into the parking lot to begin his left U-turn. He looked across the highway and watched for oncoming traffic in the eastbound lanes, while Ms. Stanford spotted oncoming traffic for him in the westbound lanes. Ms. Stanford communicated to Mr. Cowart that westbound traffic would be clear once two vehicles passed. Once those two vehicles passed, Mr. Cowart began his left U-turn. The front of Mr. Cowart's semi-truck cab had almost made it past the center line of Highway 190 when the cab collided with Mr. Glaser's pickup truck.

Emergency responders arrived at the scene of the accident. Mr. Glaser was able to exit his vehicle and walk to a gurney to be transported by ambulance to Baton Rouge General Medical Center ("BRG").

Upon admission to BRG's intensive care unit ("ICU"), medical providers diagnosed Mr. Glaser with four fractured ribs, a fractured sternum, a chest hematoma, bruises to his abdomen and lungs, moderate effusion to the right lung, a compression fracture of the lumbar spine, a distended abdomen, and a closed head injury with concussion. Over the next four days, Mr. Glaser was able to sit in a chair,

4

stand, and walk, although he was still experiencing pain. On the fifth day after the accident, medical providers diagnosed Mr. Glaser with an ileus, which is an impairment or stoppage of the flow of intestinal contents due to an obstruction or diminished intestinal motility.[1] His medical providers began undertaking procedures to try to alleviate the intestinal disorder; however, Mr. Glaser's colon perforated on May 25, 2020. Mr. Glaser died on May 26, 2020, approximately two weeks after the accident, at the age of eighty-nine.

## PROCEDURAL HISTORY

Mr. Glaser's seven adult children—who ranged in age from 59 to 69 at the time of his injury and death—filed a survival action as his representatives, pursuant to La. C.C. art. 2315.1. They also filed wrongful death actions on their own behalf under La. C.C. art. 2315.2.[2] Named as defendants were the driver, Steven Ray Cowart; Mr. Cowart's employer, Rail 1;[3] Rail 1's insurers, Hartford Fire Insurance Company and Hartford Casualty Insurance Company (collectively, "Hartford");[4] Mr. Glaser's personal automobile insurer, Louisiana Farm Bureau Casualty Insurance Company ("Farm Bureau");[5] and the State of Louisiana, through the

---

[1] The symptoms of an ileus are abdominal bloating and pain caused by a buildup of gas and liquids, nausea, vomiting, severe constipation, loss of appetite, and cramps. See "ileus," I-2, *Attorney's Illustrated Medical Dictionary* (Ida G. Dox, Gilbert M. Eisner, June L. Melloni, and B. John Melloni, eds., West 1997).

[2] On June 10, 2020, Gerald Wayne Glaser, Trudy Glaser, and Robert Glaser filed a survival action as Mr. Glaser's representatives and wrongful death actions on their own behalf (the "Marionneaux plaintiffs"). See Docket Number 49803, Division "C," 18th Judicial District Court, Parish of Pointe Coupee, State of Louisiana. Karl Glaser joined the survival action and filed a wrongful death action on his own behalf on March 11, 2021. On October 27, 2020, Danna J. Glaser, Barbara G. Lacombe, and Charles R. Glaser, Jr. filed a second survival action as Mr. Glaser's representatives, as well as wrongful death actions on their own behalf (the "Cazayoux-Ewing plaintiffs"). See Docket Number 50012, Division "A," 18th Judicial District Court, Parish of Pointe Coupee, State of Louisiana. The trial court signed an order consolidating the two cases on January 13, 2021.

[3] Mr. Cowart was acting in the course and scope of his employment with Rail 1 at the time of the accident.

[4] At all material times, Hartford Fire Insurance Company issued a business automobile policy (no. 21UENOE6254), and Hartford Casualty Insurance Company issued an umbrella policy (no. 21HHUOZ6255), to Rail 1 and its permissive driver, Mr. Cowart. These policies provided coverage for any judgment rendered against Rail 1 or Mr. Cowart regarding the accident at issue.

[5] Farm Bureau issued an insurance policy (no. A-X82526) to Mr. Glaser, which provided medical payment coverage, uninsured/underinsured motorist coverage, and death payment coverage.

5

Department of Transportation and Development ("DOTD"). Farm Bureau asserted cross-claims against Mr. Cowart, Rail 1, and Hartford, seeking indemnity and in the alternative, contribution, from the cross-claim defendants.

Prior to trial, the trial court dismissed DOTD from the suit.[6] The plaintiffs filed a motion *in limine* to prohibit the defendants from referring to, utilizing, or introducing the plaintiffs' medical malpractice action filed against Dr. Christopher J. Christensen and/or BRG. The defendants stipulated they would not seek an allocation of fault on the part of Mr. Glaser's medical providers or the hospital and further agreed that no reference would be made to the filing of a medical malpractice claim. Rail 1 also filed a motion *in limine*, seeking an order prohibiting the plaintiffs from introducing evidence at trial regarding Rail 1's direct negligence or fault.[7]

The matter proceeded to a five-day jury trial. The parties stipulated that the jury's determination of fault would only be allocated between Mr. Glaser and Mr. Cowart/Rail 1. The parties further stipulated that Mr. Glaser's past medical expenses totaled $103,230.59, and his burial and funeral expenses totaled $13,714.33. During an in-chambers conference, Farm Bureau agreed to dismiss its cross-claim against Mr. Cowart, Rail 1, and Hartford in exchange for its dismissal "as a UM in both lawsuits." Plaintiffs' counsel agreed, as did the trial court. On the second day of trial, the trial court orally granted the motion *in limine* filed by Rail 1 and prohibited the plaintiffs from introducing any evidence regarding Rail 1's direct negligence or fault.

---

[6] The trial court dismissed the plaintiffs' claims against DOTD in a summary judgment signed on August 12, 2021. The judgment decreed that no evidence of DOTD's fault would be admitted at trial or submitted to the jury, nor would DOTD be included on the jury verdict form.

[7] The plaintiffs opposed Rail 1's motion to exclude evidence of Mr. Cowart's driving violations recorded by his employer, Rail 1. We note that Rail 1 also filed a motion for partial summary judgment on this issue, seeking the dismissal of plaintiffs' claims regarding Rail 1's direct negligence. The trial court set the matter for hearing on August 24, 2021. A minute entry indicates that the trial court continued the hearing to September 20, 2021 (the first day of the jury trial); however, the record on appeal is silent as to whether the trial court held a hearing or ruled on Rail 1's motion for partial summary judgment.

Following the close of evidence and arguments, the trial court instructed the jury, which then retired to deliberate. Following deliberations, the jury returned a unanimous verdict: Mr. Cowart and Rail 1 were at fault in causing the automobile collision, and Mr. Cowart was in the course and scope of his employment with Rail 1 at the time of the automobile collision. Mr. Glaser was also at fault in causing the automobile collision. The jury allocated 80% fault to Mr. Cowart and Rail 1 and 20% fault to Mr. Glaser. The jury found that Mr. Glaser suffered damages as a result of the automobile collision and awarded him special damages and survival damages: 1) $103,230.59 for past medical expenses; 2) $13,714.33 for burial and funeral expenses; and 3) $10 million for survival damages. The jury further concluded that each of Mr. Glaser's seven children sustained wrongful death damages and awarded them $1.5 million each (totaling $10.5 million). The jury's compensatory damages award totaled $20,616,944.92.

The trial court signed a judgment in accordance with the jury's verdict on October 21, 2021. Thereafter, pursuant to La. C.C.P. art. 1951 and with the consent of all parties, the trial court signed an amended final judgment on December 15, 2021. The trial court rendered judgment in the total amount of $16,493,555.94 (reflecting a 20% reduction of the jury's compensatory damages verdict of $20,616,944.92, for Mr. Glaser's fault), in favor of Mr. Glaser's seven children and against Mr. Cowart, Rail 1, and Hartford, *in solido*, for $11 million, and against Mr. Cowart and Rail 1, *in solido*, for $5,493,555.94, allocated as follows:

- judgment in favor of Mr. Glaser's seven children for survival damages in the sum of $8,093,555.94 (reflecting a 20% reduction of the jury's survival damages verdict of $10,116,944.92, for Mr. Glaser's fault), plus legal interest on each plaintiff's equal share from the date of judicial demand;

- judgment in favor of each of Mr. Glaser's seven children for wrongful death damages in the amount of $1.2 million each (reflecting a 20% reduction of the

7

jury's wrongful death damages verdict of $1.5 million each, for Mr. Glaser's fault), plus legal interest from the date of judicial demand; and

- judgment ordering Mr. Cowart, Rail 1, and Hartford, *in solido*, be assessed with all costs of the proceedings.

Thereafter, the plaintiffs filed motions for JNOV, or alternatively, motions for new trial. The defendants filed a motion for JNOV and motion for new trial, or alternatively, motion for remittitur, and in the further alternative, motion to amend judgment. The trial court denied all the motions in a judgment signed on December 17, 2021. The defendants now appeal.[8] The plaintiffs have answered the appeal.

## LAW AND DISCUSSION

In their sole assignment of error, the defendants argue that the amount of the general compensatory damages awarded in the survival and wrongful death actions was an abuse of the jury's discretion, and the trial court erred in denying the defendants' JNOV, or alternatively, new trial, to reduce those damages to the highest amount reasonably within the jury's discretion. The defendants argue that based on the severity and duration of Mr. Glaser's injuries and subsequent death, the jury's survival damages award of $10 million for Mr. Glaser's pain and suffering and $1.5 million awarded to each of his seven adult children for their wrongful death actions (totaling $20.5 million, prior to a 20% reduction for Mr. Glaser's fault allocation) is excessively high.

### JNOV, or Alternatively, Motion for New Trial

A JNOV is a procedural device authorized by La. C.C.P. art. 1811, by which the trial court may correct an erroneous jury verdict by modifying the jury's finding of fault or damages or both. *Bourg v. Cajun Cutters, Inc.*, 2014-0210 (La. App. 1st Cir. 5/7/15), 174 So.3d 56, 61, writs denied, 2015-1306, 2015-1253 (La. 4/4/16),

---

[8] The defendants filed a motion for suspensive appeal on January 12, 2022. The trial court signed an order of appeal on January 25, 2022, notice of which was transmitted by the Clerk of Court to the parties on February 15, 2022.

190 So.3d 1201, 1205. If the verdict is supported by competent evidence and is not wholly unreasonable, the trial judge may not set it aside. *Daigle v. U.S. Fid. & Guar. Ins. Co.*, 94-0304 (La. App. 1st Cir. 5/5/95), 655 So.2d 431, 435. The trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. *Falcon v. Louisiana Dept. of Transp.*, 2013-1404 (La. App. 1st Cir. 12/19/14), 168 So.3d 476, 488, writ denied, 2015-0133 (La. 4/10/15), 163 So.3d 813 (citing *Smith v. State, Dept. of Transp. & Dev.*, 2004-1317, 2004-1594 (La. 3/11/05), 899 So.2d 516, 524-25).[9]

The standard of review of a JNOV on appeal is twofold. First, the appellate court must determine whether the jury verdict is supported by competent evidence and is not wholly unreasonable. If the verdict is supported by competent evidence and not wholly unreasonable, then the trial court may not set it aside. To make this determination, the appellate court must, after considering all of the evidence in the light most favorable to the party opposing the motion, find that it points so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict on the issue. *Faul v. Robinson*, 2019-1450 (La. App. 1st Cir. 12/16/20), 316 So.3d 1077, 1081, writ denied, 2021-00081 (La. 3/9/21), 312 So.3d 584. Second, after determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the

_____

[9] A motion for new trial may be joined with the motion for JNOV or may be prayed for in the alternative. La. C.C.P. art. 1811(A)(2). "A new trial may be granted ... to all or any of the parties and on all or part of the issues, or for reargument only." La. C.C.P. art. 1971. The peremptory grounds for a trial court's grant of a new trial are when the judgment appears clearly contrary to the law and the evidence, when a party discovers new evidence that could not have been discovered before or during trial, and when impartial justice was not done because the jury was bribed or behaved improperly. La. C.C.P. art. 1972. Finally, "[a] new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law." La. C.C.P. art. 1973. Unless an abuse of discretion is demonstrated, an appellate court cannot reverse a trial court's decision to grant or deny a motion for new trial. *Martin v. Heritage Manor South Nursing Home*, 2000-1023 (La. 4/3/01), 784 So.2d 627, 632.

9

manifest error standard of review. *Davis v. Wal-Mart Stores, Inc.*, 2000-0445 (La. 11/28/00), 774 So.2d 84, 89; *Faul*, 316 So.3d at 1081.

Therefore, our initial inquiry is: did the evidence at trial overwhelmingly support a decrease in the survival damages awarded to Mr. Glaser and the wrongful death damages awarded to his adult children such that reasonable jurors could not have concluded otherwise? If so, then the trial court erred in denying the JNOV. However, if reasonable jurors in the exercise of impartial judgment might conclude from the evidence that the amount of general compensatory damages awarded in the survival and wrongful death actions was appropriate, then the trial court was correct in denying the JNOV.

## Assessment of Quantum

It is well-settled that a judge or jury is given great discretion in the assessment of quantum, of both general and special damages. La. C.C. art. 2324.1; *Fontenot v. Louisiana Dep't of Pub. Safety & Corr.*, 2021-1213 (La. App. 1st Cir. 4/8/22), 342 So.3d 28, 35 (citing *Guillory v. Lee*, 2009-0075 (La. 6/26/09), 16 So.3d 1104, 1116). Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact that is entitled to great deference on review. *Fontenot*, 342 So.3d at 35 (citing *Wainwright v. Fontenot*, 2000-0492 (La. 10/17/00), 774 So.2d 70, 74).

In conducting our review, we are mindful that neither the trial court nor this court may substitute its evaluation of the proper amount of damages for that of the jury unless the jury's awards totally offend reasonable inferences from the evidence. *Gutierrez v. Louisiana Dep't of Transp. & Dev.*, 2011-1774 (La. App. 1st Cir. 3/23/12), 92 So.3d 380, 386, writ denied, 2012-1237 (La. 9/21/12), 98 So.3d 343. An appellate court may not overturn an award of damages unless it is so out of proportion to the injury complained of that it shocks the conscience. See *Johnson v. Montoya*, 2013-1951 (La. App. 1st Cir. 5/2/14), 145 So.3d 418, 421; *Patin v.*

10

*Duplessis Pontiac-Buick-GMC Trucks, Inc.*, 632 So.2d 790, 793 (La. App. 1st Cir. 1993), writ denied, 638 So.2d 1096 (La. 1994).

The trier of fact's independent assessment of the damages is reviewed on appeal under the restraints of *Coco v. Winston Indus., Inc.*, 341 So.2d 332, 335 (La. 1976), that is, lowering (or raising) those awards to the highest point (or lowest point) that is reasonably within the discretion afforded to the trier of fact when considering prior awards for similar injuries. As set forth by our Supreme Court in *Coco*, 341 So.2d at 335:

> [B]efore a Court of Appeal can disturb an award made by a trial court[,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence. [Internal citations omitted.]

See also *Bourg*, 174 So.3d at 70.

The standard for appellate review for abuse of discretion in the award of damages is difficult to express and is necessarily non-specific. *Cone v. Nat'l Emergency Servs., Inc.*, 99-0934 (La. 10/29/99), 747 So.2d 1085, 1089. In *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), our Supreme Court recognized:

> [T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.

See also *Malta v. Herbert S. Hiller Corp.*, 2021-00209 (La. 12/10/21), 333 So.3d 384, 407-08; *Fontenot*, 342 So.3d at 35. Thus, the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather, to review the exercise of discretion by the trier of fact. *Youn*, 623 So.2d at 1260.

In determining whether an "abuse of discretion" has occurred, the *Youn* court noted that "[e]ach case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration." *Youn*, 623 So.2d at 1260. Our inquiry therefore is a narrow one: whether the particular effects of the particular injuries on the particular plaintiff are such that there has been an abuse of the much discretion vested in the trier of fact. *Youn*, 623 So.2d at 1260. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances so as to constitute an abuse of discretion that the appellate court should resort to prior awards in determining what would be an appropriate award for the present case. *Youn*, 623 So.2d at 1261. Accordingly, resorting to a comparison of prior awards is *only appropriate* after the reviewing court has concluded that an abuse of discretion has occurred. *Cone*, 747 So.2d at 1089; *Coco*, 341 So.2d at 335; *Rideau v. State Farm Mut. Auto. Ins. Co.*, 2006-0894 (La. App. 1st Cir. 8/29/07), 970 So.2d 564, 579, writ denied, 2007-2228 (La. 1/11/08), 972 So.2d 1168.

Thus, the initial inquiry for this Court is whether the jury abused its discretion in assessing the amount of damages. If we conclude that it has, then and only then may prior awards be used for determining the highest or lowest amount that was reasonably within that discretion. *Cone*, 747 So.2d at 1089.

**Survival Action**

Applying these standards, we first address the jury's award for the survival action. In a survival action, certain beneficiaries of the deceased have the right to recover the damages for injuries that the deceased suffered and would have been entitled to recover from the tortfeasor, had the deceased lived. La. C.C. art. 2315.1; *Sacco v. Allred*, 2002-0141 (La. App. 1st Cir. 2/19/03), 845 So.2d 528, 538. The survival action permits recovery only for the damages suffered by the victim from the time of the injury to the moment of death. The elements of damage for the survival action are pain and suffering, loss of earnings, and other damages sustained by the victim up to the moment of death. *White v. Entergy Gulf States Louisiana, L.L.C.*, 2013-1608 (La. App. 1st Cir. 11/10/14), 167 So.3d 764, 770, writ denied, 2015-0478 (La. 5/15/15), 170 So.3d 163; *Thompson v. Crawford*, 2017-1400 (La. 11/13/17), 229 So.3d 451, 452 (*per curiam*).

At trial, the jury heard testimony and received evidence that showed that as a result of the accident, Mr. Glaser suffered "polytrauma"—trauma to more than one area of the body—and sustained four fractured ribs (two on each side); a fractured sternum; a chest hematoma; a compression fracture of the lumbar spine; abdominal bruises and hematoma; bruises to both lungs; moderate effusion (*i.e.*, fluid) to the right lung; a distended abdomen; and a closed head injury with concussion.

As is common with polytrauma patients, during the fourteen days he was in the hospital, Mr. Glaser's condition would improve, only to regress. In the first three days following the accident, Mr. Glaser was awake and alert and able to speak and orient himself. However, he experienced "tremendous" pain and received oxycodone and morphine. On the fourth day after the accident (May 17), Mr. Glaser suffered severe bruising and swelling of his testicles. Although still complaining of pain, Mr. Glaser was able to sit in a bedside chair on oxygen, in no apparent distress

13

and with stable vital signs. He was able to stand, walk with "encouragement," and was agreeable to further evaluations.

On the fifth day after the accident (May 18), Mr. Glaser was still able to walk and orient himself. His medical providers believed he was ready to leave the ICU and be admitted to the floor. However, Mr. Glaser had not had a bowel movement since the day prior to his accident (May 12); his abdominal distension had begun to worsen. Six days after the accident (May 19), Mr. Glaser's digestive system began to fail.[10] Medical providers diagnosed him with an ileus, neurological damage to the gut where the gut does not push stool, liquid, or air down the gastrointestinal ("G.I.") tract, which causes abdominal distension. Although Mr. Glaser was still able to stand up and walk with assistance, he stated, "I'm not sure I'm gonna make it."

Medical providers began decreasing Mr. Glaser's pain medication and administering laxatives, electrolytes, and other medications. When those measures proved unsuccessful, his medical providers began a bowel program/G.I. protocol in attempts to alleviate the pressure in his abdomen caused by the ileus. After scans and a manual dis-impaction attempt, Mr. Glaser's medical providers were able to confirm that there were no obstructions in his digestive system. A nasogastric ("NG") tube was then inserted down Mr. Glaser's nose and into his esophagus and stomach, while another tube was inserted into his rectum. Medical providers then compressed and decompressed his stomach in attempts to relieve the abdominal pressure. Mr. Glaser also underwent three enemas and a colonoscopy. Unfortunately, these attempts to alleviate the pressure in Mr. Glaser's abdomen failed. He experienced no relief and was reported as "screaming out in pain." Mr. Glaser began

---

[10] Dr. Everett Bonner, who treated Mr. Glaser at BRG in his capacity as a general surgeon, testified that polytrauma patients "will start having GI [gastrointestinal] issues, meaning that the GI system won't work because of all the significant trauma, all the medications we're giving them between pain medicine, all the ICU medications [they] go on. What happens is you'll get constipation or you'll get what [Mr. Glaser] had, ileus and dysmotility of the GI system." Dr. Bonner also testified that pain medication worsens ileus symptoms and causes the digestive system to slow down.

pulling out his tubes and I.V.s and had to be restrained to the hospital bed, where he remained restrained until his death. At one point, Mr. Glaser reported pain so bad that he wished his medical providers "would just shoot him."

Surgery remained the only option to relieve Mr. Glaser's abdominal distension. His medical providers discussed doing an exploratory laparotomy to open his abdominal cavity and assess his condition, or possibly a total removal of Mr. Glaser's colon and placement of an ostomy.[11] Then, on the twelfth day after the accident (May 25), Mr. Glaser's colon perforated. After medical providers informed his family that Mr. Glaser would not likely survive with or without surgical intervention, his family decided that Mr. Glaser would not undergo an operation. Mr. Glaser died the next day on May 26, 2020—thirteen days after the accident.

The evidence supports the jury's finding that Mr. Glaser endured mental anguish, physical pain, and suffering for fourteen days prior to his death. There is no question that the fear and fright experienced by Mr. Glaser during this ordeal leading to his death contributed to his mental anguish. See Maldonado v. Kiewit Louisiana Co., 2012-1868, 2012-1869 (La. App. 1st Cir. 5/30/14), 152 So.3d 909, 936-37, writ denied, 2014-2246 (La. 1/16/15), 157 So.3d 1129. As discussed above, Mr. Glaser told medical providers he was "not sure I'm gonna make it;" he screamed out in pain; he pulled out his tubes and I.V.s; he had to be restrained to his hospital bed; and he expressed his wish that his medical providers "would just shoot him." Mr. Glaser's mental anguish was compounded by the fact that due to the COVID-19 pandemic, the hospital had a restricted visitation policy in place that prevented Mr. Glaser's family and friends from regularly visiting him. The plaintiffs' contact with their father can be summarized as irregular "FaceTime" calls and brief visits by each

[11] An ostomy is an artificial opening created surgically; in this instance, to allow bodily waste to pass through the opening into an ostomy bag on the outside of the body. See "ostomy," O-23, Attorney's Illustrated Medical Dictionary (Ida G. Dox, Gilbert M. Eisner, June L. Melloni, and B. John Melloni, eds., West 1997).

15

of the children to say their "last words" once medical providers determined that Mr. Glaser was not going to survive. Thus, in our review of the jury's verdict, we conclude the jury verdict granting recovery for survival damages was supported by competent evidence.

However, we conclude that reasonable persons could not differ that the award for Mr. Glaser's survival action was abusively high beyond that which a reasonable trier of fact could assess for the effects of the particular injuries to Mr. Glaser under the particular circumstances. The evidence showed that Mr. Glaser was able to exit his vehicle and walk to a gurney to be transported by ambulance to BRG. During his first six days in the ICU, Mr. Glaser was able to talk, orient himself, sit up, stand, and walk. By May 18, his medical providers were discussing moving him from the ICU unit to be admitted to the hospital floor. It was not until Mr. Glaser's digestive system completely failed and his medical providers diagnosed him with an ileus that he entered the end stages of his life. The jury's survival damages award of $10 million shocks the conscience and offends reasonable inferences from the evidence, especially considering Mr. Glaser's condition actually improved during his first six days in the hospital, and only later worsened. Accordingly, we find the jury abused its discretion in its award of survival damages, and the trial court manifestly erred in denying the defendants' JNOV.

Because we have concluded that the jury abused its discretion in awarding Mr. Glaser $10 million in survival damages, we now resort to a comparison of prior awards. See *Youn*, 623 So.2d at 1261; *Cone*, 747 So.2d at 1089. His damages must be set in accordance with *Coco*, 341 So.2d at 335, that is, lowering the award to the highest point that is reasonably within the discretion afforded to the trier of fact. Based on the totality, severity, and fourteen-day duration of Mr. Glaser's pain and suffering, this Court finds that the highest award reasonably within the jury's

16

discretion for general damages for a survival action is $2 million.[12] See *Bujol v. Entergy Servs., Inc.*, 2000-1621 (La. App. 1ˢᵗ Cir. 8/14/02), 833 So.2d 947, 981-83, opinion modified on reh'g (Jan. 6, 2003), writs granted, 2003-0492, 2003-0502 (La. 5/16/03), 843 So.2d 1115, rev'd on other grounds, 2003-0492 (La. 5/25/04), 922 So.2d 1113 ($1.75 million survival award to burn victim who lived for six days after accident);[13] *Dakmak v. Baton Rouge City Police Dep't*, 2012-1468 (La. App. 1ˢᵗ Cir. 9/4/14), 153 So.3d 498, 507-08 ($1 million survival award to elderly driver who died less than three months after motor vehicle collision);[14] *Hicks v. State*, 34,890 (La. App. 2ⁿᵈ Cir. 12/7/01), 802 So.2d 1005, 1013, writ denied, 2002-0040 (La. 3/22/02),

---

[12] We note that this Court recently affirmed a jury's $10.75 million general damages award to a motor vehicle accident ("MVA") victim for his past and future physical pain and suffering, past and future mental pain and suffering, loss of enjoyment of life, disability, and scarring and disfigurement. As a result of the MVA, the victim suffered injury to his head, face, neck, shoulder, and cervical and lumbar spine; sustained a mild to moderate traumatic brain injury, which left him with an executive function in the mildly impaired range; and suffers from daily headaches, depression, and physical and mental pain. This Court found the general damage award was appropriate given the victim's age, his relationship with his family, his community, his health prior to the accident, his serious, disfiguring, and permanent deficits from his injuries, his evidence of serious depression, and his inability to return to work. *Barber Bros. Contracting Co., LLC v. Capitol City Produce Co., LLC*, 2022-0696, 2022-0697 (La. App. 1ˢᵗ Cir. 5/8/23), __ So.3d__, 2023 WL 3301245, writ pending, 2023-00788 (La. 6/6/23). The general damage award did not specify the amount of the award attributable to the victim's past physical and mental pain and suffering. Chief Judge Guidry dissented in part, finding that the general damages award was beyond that which a reasonable trier of fact in his discretion could assess. He would have reduced the general damages award to $4.3 million. *Barber*, 2023 WL 3301245 at *7, n.2 (Guidry, C.J., dissenting in part).

We find that *Barber* is factually distinguishable from the particular injuries to Mr. Glaser under the particular circumstances; specifically, Mr. Glaser did not sustain any brain injury and survived for only thirteen days following the accident.

[13] In *Bujol*, this Court affirmed the trial court's decision that a $5 million survival award to a plant employee who died of injuries resulting from a flash fire was unreasonably high in light of awards to the two survivors of the fire. The trial court granted a JNOV and reduced the award to $1.75 million. The evidence introduced at trial was that all three victims were horrifically burned. The employee who died lived for six days, while the two survivors underwent prolonged hospitalization and treatment thereafter.

[14] In *Dakmak*, this Court affirmed the jury's award of damages of $334,000 for past physical pain and suffering, $333,000 for past mental pain and suffering, and $333,000 for loss of enjoyment of life ($1 million total) in a survival action arising from the death of an 83-year-old driver approximately three months after he was in a collision with a police officer who was negligent in a high-speed attempt at catching up to a possible suspect. The driver's spinal cord was severed in the accident, which resulted in paraplegia from the umbilicus down. The driver suffered excruciating neck and back pain, a left ankle fracture, lung contusions, and decubitus ulcers, including a grapefruit-sized stage three ulcer on his sacrum with exposed bone as a consequence of his paralysis. The driver became acutely depressed and refused further treatment when told he would never walk again.

17

811 So.2d 941 ($1.035 million survival award to motorist who was rendered quadriplegic and required hospitalization until death, five months after motor vehicle accident);[15] *Wingfield v. State ex rel. Dep't of Transp. & Dev.*, 2001-2668, 2001-2669 (La. App. 1st Cir. 11/8/02), 835 So.2d 785, 809, writs denied, 2003-0313, 2003-0339, 2003-0349 (La. 5/30/03), 845 So.2d 1059, 1060, cert. denied, 540 U.S. 950, 124 S.Ct. 419, 157 L.Ed.2d 282 (2003) ($800,000 survival award to deceased tractor-trailer passenger who survived for three hours after the accident).[16]

## Wrongful Death Actions

While it is impossible to place a monetary value on the life of a person, our jurisprudential system has established that a monetary award is the appropriate remedy to one who has suffered the loss of a loved one as a result of the fault of another. *Moss v. State*, 2007-1686 (La. App. 1st Cir. 8/8/08), 993 So.2d 687, 704, writ denied, 2008-2166 (La. 11/14/08), 996 So.2d 1092 (citing *Anderson v. New Orleans Pub. Serv., Inc.*, 583 So.2d 829, 833 (La. 1991)). Wrongful death damages are meant to compensate the designated survivors for their loss of the decedent. See La. C.C. art. 2315.2. The elements of the award include loss of love, affection, companionship, services, and support, as well as medical and funeral expenses. *Moss*, 993 So.2d at 704. In this case, the jury made separate awards for medical and funeral expenses. The only wrongful death awards the defendants contest are those

---

[15] The Second Circuit affirmed a survival award of $1.035 million in *Hicks* for the pain and suffering, mental anguish, and pre-impact fear experienced by a motorist who died as a result of injuries sustained when he lost control of his vehicle while passing through a defective highway intersection constructed by DOTD. The motorist suffered spinal cord damage, which required hospitalization until his death (five months after the accident), and rendered him quadriplegic, unable to breathe without medical intervention, and incapable of providing for his basic needs.

[16] This Court reinstated a jury award for survival damages of $800,000 in *Wingfield* for a tractor-trailer passenger's pain and suffering after a tractor-trailer that the passenger was riding in rolled over a highway ramp railing while entering a sharp ramp curve. The passenger suffered one complete leg amputation and one crushed leg, with partial amputation, severe chest injuries, and other serious injuries such as several fractured ribs and massive bleeding throughout his body, including the brain and kidneys. The passenger was conscious at the scene of the accident and survived for three hours.

for the plaintiffs' loss of love, affection, companionship, services, and support from their father.

Mr. Glaser's seven surviving adult children testified at trial.[17]

Karl Glaser, who was 62 years old at the time of trial, is a sugarcane farmer. He testified that he saw his father four or five times a week and that Mr. Glaser drove a tractor at his farm cutting grass at least two to three days a week. Karl stated that he also accompanied his father to doctor's appointments. When asked on a scale of zero to ten about his relationship with Mr. Glaser—zero being he did not see his father often and ten being he saw his father every day—Karl responded, "ten." Karl testified that the last time he saw his father—the day before the accident—his father was at the farm driving the tractor and cutting grass, "doing what he wanted to do." When he received the call from his sister, Danna, that Mr. Glaser had been in an accident, Karl drove to the scene and was able to wave to his dad as he was loaded into the ambulance. Karl stayed at the scene to clean up and take care of his father's truck.

Robert Glaser testified that after he finished high school, he took up welding and got his certification to help out his father "because it seemed like every time we turned around we needed something welded." Prior to Mr. Glaser's death, Robert helped his father out on his brother Karl's farm after work and on the weekends. Robert stated he helped his father with "odds and ends." Robert testified that his father taught him the value of hard work and that his best characteristics attributable to his father are his manners and politeness. The day of the accident, Robert traveled to the hospital with his sisters to await Mr. Glaser's ambulance; when it arrived, Robert held his father's hand.

---

[17] Three of Mr. Glaser's children preceded him in death.

Trudy Glaser was 65 years old at the time of trial. She testified that she often traveled to Texas for work, but that she resided in Louisiana. Trudy purchased the family home in Maringouin, where Mr. Glaser resided prior to his death. Trudy stated that when she was home in Louisiana, she lived in the house with her father. Trudy described her father as a "true Southern gentleman," and "the nicest man" who was "kind to everyone he met."

Danna Glaser testified that she ate breakfast with Mr. Glaser at the family home a few days a week. She also stated that she saw her father every afternoon during the week and visited him every Sunday. Danna helped refill her father's pill box and scheduled doctor's appointments for him. Danna testified that the entire family gathered for Mr. Glaser's birthday every year to celebrate him. The day of the accident, Danna and Mr. Glaser had breakfast, and then Mr. Glaser left to pick up boudin for a store Danna and her husband owned. When Danna received the call about the accident, she drove to the scene and witnessed her father being pulled from his truck.

Barbara Glaser Lacombe testified that she was 69 years old and was the oldest of Mr. Glaser's children. According to Barbara, she and her siblings helped care for Mr. Glaser after their mother passed away in 2008. Barbara stated that she accompanied Mr. Glaser to doctor's appointments, often reminded him to take his medication, and helped refill his pill box. Barbara testified that her father made a point to visit "each and every one of" his children. When she spoke to her siblings on the phone, they would tell each other they got "the visit" from Mr. Glaser. Barbara stated that her father was such a large presence in the lives of the entire family and that she felt "emptiness" after he died.

Charles "Brother" Glaser, Jr., age 67, testified that he saw his father two or three times a week, sometimes every day, when his father drove through the field next to his house to visit a family orchard behind his garden. Sometimes, Mr. Glaser

would sneak up on Charles while he was working in the garden and blow the horn to jokingly startle him. Charles stated that his father would stop for a chat whenever he visited—Mr. Glaser would drive a tractor and cut grass in the orchard or pick pecans, depending on the season. Charles testified that the family gathered at Mr. Glaser's house for every holiday and birthday celebration, but that since his father's death, the family does not get together as much as they did when their father was alive. Charles stated that his father was "that magnet drawing us together."

Gerald Wayne Glaser testified that after he completed his education, he went to work on the farm with his father and drove a crude oil truck. He stated that he was often able to work alongside his father in the field and driving trucks. Gerald, who lives in Baton Rouge, worked seven days a week and was only occasionally able to visit Mr. Glaser during the week and on the weekends; however, he testified that he had accompanied Mr. Glaser to doctor's appointments. Gerald testified that Christmas was an especially "big holiday" for the Glaser family because his father's and sister's birthdays were right before Christmas, so the entire family would combine the celebrations. Gerald stated that the last time he saw his father was a week before the accident, when he was working near Mr. Glaser, so he dropped in and had a "nice visit" with his father.

Based upon our review of the testimony, we conclude the jury verdict granting recovery for wrongful death damages was supported by competent evidence. However, as with the award for survival damages, we find the jury abused its discretion in its award of $10.5 million in wrongful death damages, and the trial court manifestly erred in denying the defendants' JNOV. Thus, we resort to prior awards for the purpose of determining the highest or lowest point that is reasonably within the discretion afforded to the trier of fact. See Youn, 623 So.2d at 1260. While no one questions the love, affection, and companionship enjoyed by the Glaser family, $1.5 million to each child is unsupportable in light of the fact that these adult

21

children were not members of their father's household or dependent upon him for support; we find that the highest award reasonably within the jury's discretion for wrongful death damages is $500,000 each to the adult Glaser children.[18] See *Bujol*, 833 So.2d at 983 ($400,000 wrongful death awards to each of three adult sons);[19] *Simmons v. CTL Distribution*, 2003-1301 (La. App. 5th Cir. 2/23/04), 868 So.2d 918, 927, writs denied, 2004-0743, 2004-0764 (La. 5/14/04), 872 So.2d 524 ($300,000 wrongful death award to adult son); *Hicks*, 802 So.2d at 1013 ($125,000 wrongful death awards each to five adult children for the loss of their father);[20] *Roberts v. Owens-Corning Fiberglas Corp.*, 2003-0248 (La. App. 1st Cir. 4/2/04), 878 So.2d 631, 644, writ denied, 2004-1834 (La. 12/17/04), 888 So.2d 863 (wrongful death awards of $250,000 each to three adult children were reasonable).

## PLAINTIFFS' ANSWERS TO THE APPEAL

The plaintiffs filed answers to the appeal pursuant to La. C.C.P. art. 2133.[21]

When an unrestricted appeal is taken from a final judgment, an appellee may seek

---

[18] In *Barber Bros. Contracting Co.*, __ So.3d at __, 2023 WL 3301245 at *6-7, this Court also affirmed loss of consortium awards of $1.5 million each to two minor children (ages 14 and 9). Chief Judge Guidry dissented in part, and would have reduced the awards to the two minor children to $50,000 each.

We find that *Barber* is distinguishable; the adult Glaser children were not members of their father's household or dependent upon him for support.

[19] In *Bujol*, the jury awarded $1 million to each of the victim's three adult sons. This Court affirmed the trial court's granting of a JNOV to reduce the awards to $400,000 each.

[20] In *Hicks*, the Second Circuit found the trial court's awards of $250,000 each to five adult children (aged 37-48 at the time of their father's death) to be "clearly excessive and an abuse of discretion," and reduced the wrongful damage awards to $125,000 each "as the highest sum reasonably within the trial court's discretion, and which we can affirm." *Hicks*, 802 So.2d at 1012-13.

[21] Louisiana Code of Civil Procedure article 2133(A) provides:

> An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later. The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer. Additionally, however, an appellee may by answer to the appeal, demand modification, revision, or reversal of the judgment insofar as it did not allow or consider relief prayed for by an incidental action filed in the trial court. If an appellee files such an answer, all other parties to the incidental demand may file similar answers within fifteen days of the appellee's action.

review of all adverse interlocutory rulings by filing an answer to the appeal. See La. C.C.P. art. 2133(A); *Thompson v. Ctr. for Pediatric & Adolescent Med., L.L.C.*, 2017-1088 (La. App. 1st Cir. 3/15/18), 244 So.3d 441, 447 n.2, writ denied, 2018-0583 (La. 6/1/18), 243 So.3d 1062. Under La. C.C.P. art. 2133, the answer to the appeal must state what the "relief demanded" is, and the answer operates as an appeal only from those matters "of which he complains in his answer." *Stevens v. St. Tammany Par. Gov't*, 2017-0959 (La. App. 1st Cir. 7/18/18), 264 So.3d 456, 466, writ denied, 2018-2062 (La. 2/18/19), 265 So.3d 773.

In their answers to the appeal, the plaintiffs seek to modify, reverse, or revise the trial court's December 15, 2021 amended judgment on the allocation of fault between the parties and also seek a reversal of the trial court's December 17, 2021 judgment denying the plaintiffs' respective motions for JNOV, or in the alternative, motions for new trial. The plaintiffs are aggrieved by the percentage of fault allocated to Mr. Glaser, arguing that he was not at fault in causing the accident and that 100% of the fault should be allocated to Mr. Cowart and Rail 1.[22]

### Allocation of Fault

Louisiana courts have adopted a duty-risk analysis in determining whether to impose liability under the general negligence principles as set forth in the Civil Code. See *Brewer v. J.B. Hunt Transport, Inc.*, 2009-1408 (La. 3/16/10), 35 So.3d 230, 240. In order for liability to attach under the duty-risk analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard of care (or the defendant owed a duty of care to the plaintiff) (the

---

[22] The plaintiffs also seek modification of the trial court's judgment rendered in open court on the second day of trial, which granted Rail 1's motion *in limine*, prohibiting the introduction of evidence regarding Rail 1's direct negligence. In *Martin v. Thomas*, 2021-01490 (La. 6/29/22), 346 So.3d 238, 245—rendered after the jury trial in this matter—the Louisiana Supreme Court held that an employer sued for both direct negligence and vicarious liability for an employee's negligence is not automatically relieved from liability for direct negligence merely by stipulating that the employee was acting in the course and scope of employment. However, based upon our reallocation of fault between Mr. Cowart/Rail 1 and Mr. Glaser, we need not address this issue.

duty element); (2) the defendant failed to conform his conduct to the appropriate standard (or breached the requisite duty) (the breach element); (3) the defendant's substandard conduct was a cause-in-fact of the harm or the plaintiff's injuries (the cause-in-fact element); (4) the risk of harm was within the scope of protection afforded by the duty breached (the scope of the duty, scope of protection, or legal cause element); and (5) actual damages (damages element). *Bellanger v. Webre*, 2010-0720 (La. App. 1st Cir. 5/6/11), 65 So.3d 201, 207, writ denied, 2011-1171 (La. 9/16/11), 69 So.3d 1149. See also *Lazard v. Foti*, 2002-2888 (La. 10/21/03), 859 So.2d 656, 659.

In apportioning fault, we must consider both the nature of the conduct of each party and the extent of the causal relation between the conduct and the damages claimed. *Bourg*, 174 So.3d at 68 (citing *Watson v. State Farm Fire and Casualty Insurance Co.*, 469 So.2d 967, 974 (La. 1985)). In assessing the nature of the parties' conduct, factors that may influence the degree of fault allocated include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances that might require the actor to proceed in haste, without proper thought. *Watson*, 469 So.2d at 974.

Louisiana Revised Statutes 32:58(A) provides, in pertinent part, that "[a]ny person operating a motor vehicle on the public roads of this state shall drive in a careful and prudent manner, so as not to endanger the life, limb, or property of any person." Louisiana Revised Statutes 32:124 provides, that "[t]he driver of a vehicle about to enter or cross a highway from a private road, driveway, alley or building, ... shall yield the right of way to all approaching vehicles so close as to constitute an immediate hazard." An individual driver owes a duty of being reasonably observant of conditions that might affect the operation or use of his vehicle that

24

would pose an unreasonable risk of harm to others. *Adams v. Par. of E. Baton Rouge*, 2000-0424, 2000-0425, 2000-0426, 2000-0427 (La. App. 1st Cir. 11/14/01), 804 So.2d 679, 698, writ denied, 2002-0448 (La. 4/19/02), 813 So.2d 1090. It is well-settled that left turns or U-turns are the most dangerous maneuvers a motorist can undertake; he must make sure that such maneuvers can be accomplished without danger to traffic to his left or rear. *Booth v. Aetna Cas. & Sur. Co.*, 220 So.2d 188, 192 (La. App. 1st Cir. 1969). An on-coming motorist has a right to assume that a left-turning motorist will yield the right-of-way. *Dakmak*, 153 So.3d at 504; *Anderson v. May*, 2001-1031 (La. App. 5th Cir. 2/13/02), 812 So.2d 81, 85. The evidence shows that Mr. Cowart also agreed to Rail 1's Company Vehicle Policy, which stated:

> It is the driver's responsibility to operate the vehicle in a safe manner and to drive defensively to prevent injuries and property damage. The Company expects each driver to drive in a safe and courteous manner pursuant to the following safety rules. The attitude you take when behind the wheel is the single most important factor in driving safely.

The jury heard testimony and saw evidence that Highway 190 is a four-lane highway divided by a six-foot median with a center guardrail, with a speed limit of 55-miles-per-hour. At the site of the accident, Highway 190 West has a ten-foot paved shoulder; an eleven-foot outside lane; a twelve-foot inside lane; and a six-foot median. Mr. Cowart operated a semi-truck pulling a tractor-trailer, which measured seventy-seven feet in length. After Ms. Stanford—the lead driver in the Rail 1 caravan—successfully completed her left U-turn from Highway 190 West to the eastbound lanes of the highway, she pulled onto the shoulder of Highway 190 East to "spot" for the other two drivers. The Rail 1 drivers communicated via CB radio or hands-free cell phones while watching for oncoming traffic. Ms. Stanford spotted traffic in the westbound lanes, while Mr. Cowart looked out for traffic in the eastbound lanes. Mr. Cowart then attempted the left U-turn. Ms. Stanford testified:

I said, okay, you got three or four coming, let them pass. He let them pass. I said, you got two more coming. I said one of them is a van. He said copy that, too, and I see the van. And I said, you got it after that.

And the next thing I know, those two pass, and as they were passing, this truck I guess was behind that van, and right before [Mr. Cowart] went -- right when he thought the van was going to clear and he went and pulled out, as soon as his wheels got into the right-hand lane on the westbound side, that man, I don't know if he moved out from behind that van or what. I never saw the man in the truck. I would have certainly never told my buddy to pull out. But he pulled out and the man hit him in the driver's side right at the tire ....

\*\*\*

**Q.** State it a different way: Those two vehicles that you did see and the van being the second one in the rear traveling west, you simply never saw the white Ford F-150 truck that was involved in the collision, correct?

**A.** No, sir.

Mr. Cowart testified:

And [Ms. Stanford] said, "you have two vans coming to you. As soon as [they're] clear, you're good to go." I was waiting on the red tractor-trailer headed eastbound on the other side of the highway.

\*\*\*

I pull up. He flies through the intersection, then the other two vans, clear. ... I just looked in the side-view mirror, looked ahead, looked at the side-view mirror again, checking traffic with Ms. [Stanford], said "good to go?" She said, "yes, you're good to go." Then I took off.

**Q.** And how long did it take, approximately, from where you took off to where the accident happened?

**A.** Maybe three seconds.

The defendants' accident reconstruction expert, A.J. McPhate, Sr., testified as to the heightened standard of care of a left-turning motorist:

**Q.** If an 18-wheeler is making a left-hand turn or even if a car is making a left turn from the shoulder area, they have a higher -- a heightened duty to make sure it's safe to do so?

**A.** Oh, absolutely .... There's no question about it. I mean, anytime you go to transverse -- to go across the traffic, you have a heavy duty to make sure that it's clear.

There is no question that by making the left U-turn, Mr. Cowart placed his tractor-trailer in the path of Mr. Glaser's vehicle, which led to this motor vehicle collision. The plaintiffs' accident reconstruction expert, Mike Gillen, and the defendants' accident reconstruction expert, Mr. McPhate, both testified that Mr. Cowart violated Louisiana law by performing the U-turn that caused the crash.[23] Both experts also agreed that it was impossible for Mr. Glaser to avoid the crash.

At trial, however, the defendants argued that Mr. Glaser should be found partially at fault because he was traveling 64-miles-per-hour at the point of impact, in excess of the 55-mile-per-hour speed zone. The defendants argued that had Mr. Glaser not been speeding, he could have possibly made an evasive move to avoid the collision. The jury heard testimony and saw evidence that Mr. Glaser's vehicle was equipped with a "black box," which is part of an electronic control module in a vehicle's engine. A black box is also part of an airbag control module that determines whether or not to fire an airbag in the case of an accident. A black box can store accident-related data. In this case, the black box in Mr. Glaser's vehicle recorded and stored the speed of his vehicle, in the five seconds prior to the crash. Mr. McPhate testified:

> The Ford pick-up truck also has a black box, and so the download of the black box gives a tremendous amount of data about what the truck was doing in the five seconds before the crash. And so one of the things that it tells you is how fast the truck was traveling.
>
> Now, of course, this information is internal to the truck and it's no more accurate than the speedometer itself which -- you know, if you put brand-new tires on your vehicle, then your speedometer will read differently than it does after your tires wear down. It's because the wheels are actually a little bit smaller and they turn a little bit more, and so you may read 65 on your speedometer and only be doing 63 when the tires are worn. Whenever the tire[s] are brand-new, it may be perfectly accurate because that's what's recorded. What you would see is also recorded. And so it says that Mr. Glaser was -- entered that particular area doing about 67 miles per hour. And at the

---

[23] See La. R.S. 32:58 and 32:124.

time that his vehicle struck [Mr. Cowart's tractor-trailer], he was down to about 64 miles per hour.

Mr. McPhate stated, however, that the black-box speed recorded at the point of impact could be inaccurate:

> **Q.** So, though, Glaser's speedometer says "67," and at point of impact "64"; that may not be correct?
>
> **A.** No, it may not be. It's within the error of the instrumentation.
>
> **Q.** He may be going slower than that, right?
>
> **A.** That's true.

Regardless of the black box data, Mr. McPhate testified that Mr. Glaser's speed was not a factor in causing this accident because Mr. Cowart never saw Mr. Glaser's vehicle. Mr. McPhate further testified that the collision would have occurred even if Mr. Glaser had been traveling at the posted speed limit of 55-miles-per-hour:

> **Q.** Doesn't matter. Ten or 90, it doesn't matter because they never saw him, right?
>
> **A.** They never saw him. So if they never saw him, right.
>
> ***
>
> **Q.** At 55 or 65, there's going to be a crash?
>
> **A.** There's going to be a crash.

Mr. Gillen testified that Mr. Glaser's first indication of trouble was 1.4 seconds prior to impact, while Mr. McPhate testified that time was 1 second. Given the accepted "perception reaction time" of 1.5 seconds, Mr. McPhate testified that there was nothing Mr. Glaser could have done to alter the outcome of this collision. He also testified, however, that had Mr. Glaser been going 55 mph instead of 67 mph, it "would make a difference. He would have more distance[,] and he would be able to probably clear the 18-wheeler." Mr. McPhate continued to testify that while Mr. Glaser may have missed the truck, he may not have avoided a crash. Specifically, he testified that "at 55 miles an hour, he may not have hit the truck but

there was going to be a crash." He further testified that "it was difficult" to place blame on Mr. Glaser. He testified that the only person who could have avoided this collision was Mr. Cowart.

Mr. Gillen testified:

> Mr. Glaser was speeding. He was going 66 in a 55 but that did not cause this collision. Mr. Glaser could have been going 90 miles per hour[;] but for the 18-wheeler pulling out into his path in less than two seconds, that's what caused this collision. That, combined with the fact that two professional commercially-licensed drivers, who do this for a living, neither one of them saw the approaching pick-up truck on Highway 190[,] which in this area is as straight as an arrow. There's no hill. There's no curve. There are no trees. There's nothing preventing them from seeing the approaching traffic and just holding their position to let the favored traffic clear before Mr. Cowart starts making a maneuver ... blocking the highway[,] and you pull out into the roadway when the approaching traffic is less than two seconds away. Speed did not cause this collision.

Based upon the evidence presented at trial, we find that Mr. Glaser's speed, while in excess of the posted speed limit, was not a cause-in-fact of the collision; therefore, the jury manifestly erred in finding Mr. Glaser 20% at fault for causing the accident, and the trial court manifestly erred in denying the plaintiffs' JNOV. By making the left U-turn, Mr. Cowart placed his tractor-trailer in the path of Mr. Glaser's vehicle, which led to this motor vehicle collision and Mr. Glaser's injuries and damages. The testimony of both accident reconstruction experts further demonstrates that the crash was inevitable, regardless of whether Mr. Glaser was speeding—there was nothing Mr. Glaser could have done to alter the outcome of the collision. Not only was the breach of Mr. Cowart's duty as a left-turning motorist the cause-in-fact of Mr. Glaser's injuries, the breach of his duty was also a legal cause of Mr. Glaser's damages. The evidence overwhelmingly shows that the conduct of Mr. Cowart was the sole cause of this accident and Mr. Glaser's resulting injuries and damages.

## DECREE

The trial court's December 17, 2021 judgment denying defendants' motion for JNOV is reversed. The portions of the trial court's December 15, 2021 amended final judgment that awarded $10 million in survival damages and $1.5 million in wrongful death damages to each plaintiff are reversed. We render judgment notwithstanding the verdict in favor of plaintiffs and against defendants Steven Ray Cowart, Rail 1, LLC, and Hartford Fire Insurance Company, *in solido*, in the total amount of $2 million in survival damages and $500,000 in wrongful death damages to each plaintiff, plus legal interest on each plaintiff's equal share from the date of judicial demand until paid.

We grant plaintiffs' answers to the appeal. The trial court's December 17, 2021 judgment denying plaintiffs' motion for JNOV is reversed. We reverse the portion of the trial court's December 15, 2021 amended final judgment attributing 20% fault to Mr. Glaser. We render judgment notwithstanding the verdict and find defendants Steven Ray Cowart/Rail 1, LLC 100% at fault for the automobile collision.

Appeal costs are assessed one-half to defendants, Steven Ray Cowart, Rail 1, LLC, and Hartford Fire/Hartford Casualty Insurance Company; and one-half to plaintiffs.

**DENIAL OF DEFENDANTS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT REVERSED; PORTIONS OF DECEMBER 15, 2021 AMENDED FINAL JUDGMENT AWARDING PLAINTIFFS SURVIVAL DAMAGES OF $10 MILLION AND WRONGFUL DEATH DAMAGES OF $1.5 MILLION TO EACH PLAINTIFF REVERSED; JUDGMENT NOTWITHSTANDING THE VERDICT RENDERED AWARDING SURVIVAL DAMAGES OF $2 MILLION, AND WRONGFUL DEATH DAMAGES OF $500,000.00 TO EACH PLAINTIFF, PLUS LEGAL INTEREST ON EACH PLAINTIFF'S EQUAL SHARE FROM THE DATE OF JUDICIAL DEMAND UNTIL PAID.**

**PLAINTIFFS' ANSWERS TO THE APPEAL GRANTED; DENIAL OF PLAINTIFFS' MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT REVERSED; PORTION OF DECEMBER 15, 2021 AMENDED FINAL JUDGMENT AS TO FAULT ALLOCATION REVERSED;**

**JUDGMENT NOTWITHSTANDING THE VERDICT RENDERED TO ATTRIBUTE 100% OF THE FAULT TO STEVEN RAY COWART/RAIL 1, LLC.**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

**2022 CA 0534**

GERALD WAYNE GLASER, INDIVIDUALLY AND AS EXECUTOR OF THE
ESTATE OF CHARLES RAYMOND GLASER, SR., TRUDY GLASER, AND
ROBERT GLASER

VERSUS

HARTFORD FIRE INSURANCE COMPANY, STEVEN RAY COWART, RAIL 1,
LLC, AND STATE OF LOUISIANA THROUGH THE LOUISIANA DEPARTMENT
OF TRANSPORTATION

*---CONSOLIDATED WITH---*

**2022 CA 0535**

DANNA J. GLASER, INDIVIDUALLY AND AS THE EXECUTOR OF THE ESTATE
OF CHARLES RAYMOND GLASER, SR., BARBARA G. LACOMBE, AND
CHARLES R. GLASER, JR.

VERSUS

HARTFORD FIRE INSURANCE COMPANY, STEVEN RAY COWART, RAIL 1,
LLC, AND STATE OF LOUISIANA THROUGH THE LOUISIANA DEPARTMENT
OF TRANSPORTATION AND DEVELOPMENT

---

**WELCH, J.,** *concurring in part and dissenting in part.*

I respectfully concur in part and dissent in part with the majority's decision. I

concur with the majority's allocation of fault. I disagree, however, with the

majority's opinion concerning the damage awards for the wrongful death and

survival actions. I recognize that the standard for appellate review for abuse of

discretion in the award of damages is difficult to express and is necessarily non-

specific. **CD v. SC**, 2022-00961 (La. 6/1/23), ___ So.3d ___, ___, 2023 WL

4195811, *3; **Cone v. Nat'l Emergency Servs., Inc.**, 99-0934 (La. 10/29/99), 747

So.2d 1085, 1089. However, our Supreme Court has instructed that:

> [T]he discretion vested in the trier of fact is "**great**," **and
> even vast,** so that an appellate court should rarely disturb
> an award of general damages. Reasonable persons
> frequently disagree about the measure of general damages
> in a particular case. It is only when the award is, in either

direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. [Emphasis added.]

**Youn v. Maritime Overseas Corp.**, 623 So.2d 1257, 1261 (La. 1993), <u>cert. denied</u>, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).[1] As further set forth by our Supreme Court in **Coco v. Winston Indus., Inc.**, 341 So.2d 332, 335 (La. 1976):

[B]efore a Court of Appeal can disturb an award made by a trial court [...] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.

I am mindful that the role of this appellate court in reviewing general damages is not to decide what we consider to be an appropriate award, but rather, to review the exercise of discretion by the trier of fact. **CD**, ___ So.3d at ___, 2023 WL 4195811 at *3; **Youn**, 623 So.2d at 1260. Neither this appellate court, nor the trial court, may substitute its evaluation of the proper amount of damages for that of the jury unless the jury's awards totally offend reasonable inferences from the evidence. **Gutierrez v. Louisiana Dep't of Transp. & Dev.**, 2011-1774 (La. App. 1st Cir. 3/23/12), 92 So.3d 380, 386, <u>writ denied</u>, 2012-1237 (La. 9/21/12), 98 So.3d 343. This Court may not overturn an award of damages unless it is so out of proportion to the injury complained of "that it shocks the conscience." <u>See</u> **Baack v. McIntosh**, 2020-01054, 2020-1117 (La. 6/30/21), 333 So.3d 1206, 1215; **Johnson v. Montoya**, 2013-1951 (La. App. 1st Cir. 5/2/14), 145 So.3d 418, 421.

Our inquiry therefore is a narrow one: whether the particular effects of the particular injuries on the particular plaintiff are such that there has been an abuse of

---

[1] <u>See also</u> La. C.C. art. 2324.1; **CD**, ___ So.3d at ___, 2023 WL 4195811 at *3; **Malta v. Herbert S. Hiller Corp.**, 2021-00209 (La. 12/10/21), 333 So.3d 384, 407-08; **Fontenot v. Louisiana Dep't of Pub. Safety & Corr.**, 2021-1213 (La. App. 1st Cir. 4/8/22), 342 So.3d 28, 35 (<u>citing</u> **Guillory v. Lee**, 2009-0075 (La. 6/26/09), 16 So.3d 1104, 1116).

the vast discretion vested in the trier of fact. **CD**, ___ So.3d at ___, 2023 WL 4195811 at *3; **Youn**, 623 So.2d at 1260-61. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances so as to constitute an abuse of discretion that the appellate court should resort to prior awards in determining what would be an appropriate award for the present case. **Youn**, 623 So.2d at 1261. Accordingly, resorting to a comparison of prior awards is *only appropriate* after the reviewing court has concluded that an abuse of discretion has occurred. **Cone**, 747 So.2d at 1089; **Coco**, 341 So.2d at 335; **Rideau v. State Farm Mut. Auto. Ins. Co.**, 2006-0894 (La. App. 1st Cir. 8/29/07), 970 So.2d 564, 579, writ denied, 2007-2228 (La. 1/11/08), 972 So.2d 1168.

## *Wrongful Death Damages*

I agree with the majority that the jury verdict granting the plaintiffs recovery for wrongful death damages is supported by the record. However, based upon my review of the record and this Court's narrow inquiry into the particular effects of the particular injures on the plaintiffs, I find no abuse of the jury's vast discretion in awarding of $1.5 million to each of the plaintiffs for the wrongful death of their father. A wrongful death award of $1.5 million is not so out of proportion to the injuries complained of—the award does not "shock the conscience."[2]

There is no question that Mr. Glaser was loved by his children and was a cherished, significant member of his family and his community. Mr. Glaser enriched the lives of his children, grandchildren, great-grandchildren, and community. It is clear from the testimony given at trial that all seven adult children loved Mr. Glaser very much and were grief-stricken by his loss. The jury perceived that each plaintiff

---

[2] See **Baack v. McIntosh**, 2020-01054, 2020-1117 (La. 6/30/21), 333 So.3d 1206, 1215; **Johnson v. Montoya**, 2013-1951 (La. App. 1st Cir. 5/2/14), 145 So.3d 418, 421; **Patin v. Duplessis Pontiac-Buick-GMC Trucks, Inc.**, 632 So.2d 790, 793 (La. App. 1st Cir. 1993), writ denied, 638 So.2d 1096 (La. 1994).

had a distinctive relationship with their father, but were all equally close to him and were devastated by his passing in their own ways. This accident tragically ended the relationships an eighty-nine-year-old father had with his seven children, which resulted in great mental anguish to his children. I find no abuse of discretion in the jury's awards of $1.5 million in wrongful death damages to each plaintiff.

Again, I note that the trier of fact is accorded much discretion in fixing general damage awards. La. C.C. art. 2324.1; **Rentrop v. Arch Ins. Co.**, 2017-0635 (La. App. 1st Cir. 12/29/17), 241 So.3d 357, 370. The discretion vested in the trier of fact is "great," even vast, so that an appellate court should rarely disturb an award of general damages. **Id.** The role of an appellate court in reviewing damages is not to decide what it considers to be an appropriate award but, rather, to review the exercise of discretion by the trier of fact. **Id.** Before an appellate court can disturb the quantum of an award, the record must clearly reveal that the trier of fact abused its discretion. **Id.** After my extensive and thorough review of the record, I find no abuse of the jury's vast discretion in awarding of $1.5 million to each of the plaintiffs for the wrongful death of their father. The majority errs by substituting their judgment for that of the jury. Here, the majority considers a $500,000.00 wrongful death damage award to each plaintiff to be an appropriate award. However, the jurisprudence shows numerous wrongful death awards in excess of $500,000.00 awarded to adult children by juries of this state. See **Stauder v. Shell Oil Company**, 2022-0593 (La. App. 4th Cir. 2/15/23), ___ So.3d ___, 2023 WL 2009251 (wrongful death awards of $2.75 million each to two adult daughters affirmed); **Williams v. Centerpoint Energy Resources Corp.**, Docket No. 600,967-C (1st JDC, Parish of Caddo, 5/9/19), 2019 WL 9103581 (wrongful death award of $1.8 million to adult daughter); **Williams v. Placid Oil Co.**, 2016-839 (La. App. 3rd Cir. 8/2/17), 224 So.3d 1101, writ denied, 2017-1501 (La. 11/17/17), 229 So.3d 929 (awards of $750,000 to each **adult child** of mother who died from exposure to asbestos);

4

**McGrail v. Lee**, 35,756 (La. App. 2nd Cir. 4/3/02), 814 So.2d 729, writ granted, 2002-1496 (La. 10/4/02), 826 So.2d 1110, order recalled, 2002-1496 (La. 4/9/03), 874 So.2d 66, and writ denied as improvidently granted, 2002-1496 (La. 4/9/03), 874 So.2d 66 (awards of $750,000 each to two adult sons (and a minor daughter) in the wrongful death of mother killed in an intersectional collision with left-turning truck affirmed); **Chauvin v. State of Louisiana through the Dept. of Transp. & Dev.** (18th JDC, Parish of West Baton Rouge, Docket No. 104,0034, 2015) (awards of $650,000, per parent, to adult daughter for wrongful death of parents killed in MVA ($1.3 million total)); **Chabaud v. Liberty Mutual Ins. Co.** (23rd JDC; Parish of Saint James, Docket No. 37,286, 2019) (awards of $600,000 each to two adult children of father diagnosed with mesothelioma); **Oddo v. Asbestos Corp.**, 2014-0004 (La. App. 4th Cir. 8/20/15), 173 So.3d 1192, writ denied, 2015-1712 (La. 11/6/15), 180 So.3d 308 (awards of $600,000 each to two adult sons whose father died four months after mesothelioma diagnosis); and **Chaisson v. Avondale Indus., Inc.**, 2005-1511 (La. App. 4th Cir. 12/20/06), 947 So.2d 171, writ denied, 2007-0411 (La. 4/5/07), 954 So.2d 145 (awards of $562,000 each to two adult children of parent who died nine months after mesothelioma diagnosis).

I find no abuse of discretion in the jury's awards of $1.5 million in wrongful death damages to each plaintiff. Because I find that no abuse of discretion has occurred, resorting to a comparison of prior awards is unnecessary; however, I specifically note that my finding is bolstered by recent jurisprudence affirming wrongful death awards to adult children in excess of $1.5 million. See **Stauder v. Shell Oil Company**, 2022-0593 (La. App. 4th Cir. 2/15/23), ___ So.3d ___, 2023 WL 2009251 (wrongful death awards of $2.75 million each to two adult daughters affirmed);[3] **Williams v. Centerpoint Energy Resources Corp.**, Docket No.

---

[3] A writ of *certiorari* has been filed with the Louisiana Supreme Court challenging the quantum and judicial interest affirmed by the Fourth Circuit in **Stauder**. As of this date, the Supreme Court has not yet decided whether to grant or deny the writ.

600,967-C (1ˢᵗ JDC, Parish of Caddo, 5/9/19), 2019 WL 9103581 (wrongful death award of $1.8 million to adult daughter).

## *Survival Damages*

I agree with the majority that the jury verdict granting Mr. Glaser recovery for survival damages is supported by the record. I likewise agree with the majority that the jury abused its discretion in awarding Mr. Glaser $10 million in survival damages because reasonable persons could not differ that the award was abusively high beyond that which a reasonable trier of fact could assess for the effects of the particular injures to Mr. Glaser under the particular circumstances. However, in resorting to a comparison of prior awards, I disagree with the majority lowering the survival damages award to $2 million.

Upon presentation to the hospital on the day of the accident, Mr. Glaser was placed in ICU to receive specialized care. Medical providers diagnosed Mr. Glaser with four fractured ribs, a fractured sternum, a chest hematoma, bruises to his abdomen and lungs, moderate effusion to the right lung, a compression fracture of the lumbar spine, a distended abdomen, and a closed head injury with concussion. These are severe and devastating injuries. Mr. Glaser's distended abdomen and other injuries indicated he suffered internal injuries. This is not surprising since the point-of-impact speed of the accident was calculated at 64-miles-per-hour.

Over the next four days in the ICU, Mr. Glaser was able to sit in a chair, stand, and walk, although he was still experiencing pain. However, on the fifth day after the accident, it was clear that Mr. Glaser had suffered grave internal injuries, which caused his bowels to shut down. His medical providers diagnosed him with ileus, an impairment or stoppage of the flow of intestinal contents. As is common with patients with significant trauma, the combination of the administered medications and trauma can lead to ileus and dysmotility of the GI system, as occurred with Mr. Glaser. His medical providers began undertaking procedures to try to alleviate the

6

ileus—all proved unsuccessful. During these attempts, Mr. Glaser was administered additional medicine, underwent scans, manual dis-impaction attempts, and had tubes inserted down his esophagus and inserted into his rectum. Mr. Glaser also underwent multiple enemas and a colonoscopy. Mr. Glaser suffered tremendous pain during these procedures, attempted to rip out his tubes and I.V.s, and had to be restrained to his hospital bed until his death. On the twelfth day after the accident, Mr. Glaser's colon perforated, and bowel and fecal matter leaked into his abdominal cavity, causing sepsis, which resulted in his death the next day—thirteen days after the accident.

Further, it is important to note that for the last fourteen days of his life, Mr. Glaser had to suffer and die alone in the hospital. Mr. Glaser's family could not support nor comfort him in final days of life due to the hospital's restricted visitation policy put in place due to the COVID-19 pandemic. Mr. Glaser had to endue great pain and suffering, coupled with emotional fear and anxiety as he faced his death. I firmly believe the jury considered this evidence in awarding Mr. Glaser survival damages.

Based on the totality, severity, and fourteen-day duration of Mr. Glaser's pain and suffering, I find that the highest award reasonably within the jury's discretion for survival action damages for the particular injures to Mr. Glaser under the particular circumstances is $3.6 million.[4] See **Williams v. Centerpoint Energy**

---

[4] In **Barber Bros. Contracting Co., LLC v. Capitol City Produce Co., LLC**, 2022-0696, 2022-0697 (La. App. 1st Cir. 5/8/23), ___ So.3d ___, ___, 2023 WL 3301245 at *5-*7, this Court recently affirmed a jury's $10.75 million general damages award to a motor vehicle accident victim for his past and future physical pain and suffering, past and future mental pain and suffering, loss of enjoyment of life, disability, scarring, and disfigurement. As a result of the accident, the victim suffered injury to his head, face, neck, shoulder, and cervical and lumbar spine; sustained a mild to moderate traumatic brain injury, which left him with an executive function in the mildly impaired range; and suffers from daily headaches, depression, and physical and mental pain. This Court found the general damage award was appropriate given the victim's age, his relationship with his family, his community, his health prior to the accident, his serious, disfiguring, and permanent deficits from his injuries, his evidence of serious depression, and his inability to return to work. **Id.** The general damage award did not specify the amount of the award attributable to the victim's past physical and mental pain and suffering. Chief Judge John Michael Guidry dissented in part, finding that the general damages award was beyond that which a reasonable trier of fact in

7

**Resources Corp.**, Docket No. 600,967-C (1ˢᵗ JDC, Parish of Caddo, 5/9/19), 2019 WL 9103581 ($3.6 million awarded to burn victim who survived 82 days in hospital and became comatose prior to death); **Thistlethwaite v. Gonzalez**, 2012-130 (La. App. 5ᵗʰ Cir. 12/18/12), 106 So.3d 238 ($3.5 million awarded to deceased semi-truck passenger);[5] **Butler v. Louisiana Mut. Medical Ins. Co.**, Docket No. 2011-03534 (Civil District Court, Parish of Orleans, 2015) (award of $3 million to an 8-year old girl who survived 8 days after misdiagnosis for "swine flu").

For these reasons, I respectfully concur in part and dissent in part.

---

his discretion could assess; he would have reduced the general damages award to $4.3 million. **Id.** at ___, 2023 WL 3301245 at *7-*8.

[5] The Fifth Circuit in **Thistlethwaite** found that the evidence supported the jury's award of survival damages to a deceased semi-truck passenger, in survival and wrongful death suit brought against the driver of a pick-up truck; specifically, $2 million for past pain and suffering and $1.5 million for past mental pain and suffering ($3.5 million total). Evidence introduced at trial indicated that the passenger was on fire when he jumped out of the burning truck, and that it was over two hours after the accident before he received any pain medication. Over the ensuing eight days prior to his death, the passenger underwent aggressive treatment, including numerous dressing changes, x-rays, and other diagnostic tests. There was also expert testimony as to the extreme pain experienced by burn patients.

# STATE OF LOUISIANA
# COURT OF APPEAL
# FIRST CIRCUIT

## DOCKET NUMBER
## 2022 CA 0534

**GERALD WAYNE GLASER, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF CHARLES RAYMOND GLASER, SR., TRUDY GLASER, AND ROBERT GLASER**

### VERSUS

**HARTFORD FIRE INSURANCE COMPANY, STEVEN RAY COWART, RAIL 1, LLC, AND STATE OF LOUISIANA THROUGH THE LOUISIANA DEPARTMENT OF TRANSPORTATION**

### CONSOLIDATED WITH

## DOCKET NUMBER
## 2022 CA 0535

**DANNA J. GLASER, INDIVIDUALLY AND AS THE EXECUTOR OF THE ESTATE OF CHARLES RAYMOND GLASER, SR., BARBARA G. LACOMBE, AND CHARLES R. GLASER, JR.**

### VERSUS

**HARTFORD FIRE INSURANCE COMPANY, STEVEN RAY COWART, RAIL 1, LLC, AND STATE OF LOUISIANA THROUGH THE LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT**

**GREENE, J., dissenting.**

I respectfully disagree with the majority opinion because it disregards the fundamental role a jury has in our judicial system. As the trier of fact, a jury is afforded much discretion in assessing facts, allocating fault, and rendering a damage award, because it is in the best position to evaluate witness credibility and see the evidence firsthand. *Tisdale v. Hedrick*, 22-01072 (La. 3/17/23), 359 So.3d 484, 490 (fault allocation); *CD v. SC*, 22-00961 (La. 6/1/23), ___ So.3d ___, ___, 2023 WL 4195811, *5 (general damages). The Louisiana Supreme Court has recently emphasized the importance of the jury in our judicial system and the great deference owed to their decisions. In *CD*, ___ So.3d ___, ___, 2023 WL 4195811, *5, the Supreme Court reinstated a jury's general damages award, finding the appellate court erred by lowering the damage award, thereby substituting its own judgment for that of the jury. In reversing the appellate court, the *CD* court reiterated the great deference owed to jury

decisions, because a jury participates in the live presentation of the case, while the appellate court merely reviews the cold transcript. *CD,* 2023 WL 4195811 at *3, n.5. The *CD* court also noted that confidence in juries, and their ability to handle and decide difficult factual questions, is reflected in the recent 2021 amendment to La. C.C.P. art. 1732, wherein the legislature lowered the jury trial threshold to $10,000. *Id.; see* 2020 La. Sess. Law Serv. 1st Ex. Sess. Act 37, eff. January 1, 2021.

In this case, the jury sat through the five-day trial, during which it heard extensive testimony and saw evidence documenting: the respective fault of the Rail 1 employee and Mr. Glaser in causing the accident; Mr. Glaser's injuries over the fourteen days he lived after the accident; and, the losses his adult children incurred as a result of his death. In its opinion, the majority reviews the evidence heard by the jury. As to the fault allocation, the majority expressly notes that Mr. Glaser was speeding at the time of the accident, and according to the defense's accident reconstruction expert, Mr. Glaser may have cleared the eighteen-wheeler had he not been speeding. Nevertheless, the majority determines the jury manifestly erred in finding Mr. Glaser partially at fault. As to survival damages, the majority specifically notes that the evidence overwhelmingly supports the jury's finding that Mr. Glaser endured tremendous mental anguish, physical pain, and suffering for fourteen days prior to his death. Nevertheless, the majority determines the jury abused its discretion in awarding $10 million in survival damages. And, as to the wrongful death damages, the majority reviews the testimony of each of Mr. Glaser's children and concludes they each had a close relationship with him and each child was devastated by his death. Nevertheless, the majority determines the jury abused its discretion in awarding $1.5 million to each child in wrongful death damages. Then, having found manifest error, the majority renders its own verdict, substituting its own evaluation of the fault allocation and damages for that of the jury.

In arriving at the amount of damages it finds proper in this case, the majority considers and analyzes certain cases while inexplicably not considering other arguably relevant cases. The inclusion or exclusion of certain cases appears to be somewhat arbitrary. Yet, since the 1996 tort reform, the legislature has convened in session 52 times (not counting veto and organizational sessions) but has not once provided any

2

limits or guidelines for damage awards in general tort cases similar to the cap for medical malpractice cases. Why is it so necessary to have a limit on general damages for a professional who fails to meet the standard of care but no limit on the damages that may be assessed against an ordinary defendant who is found to be negligent? Instead of the legislature taking action, appellate courts appear to be exercising a legislative function of creating limits to damage awards in the name of *Coco, Youn,* and various other cases.

Until the legislature acts, we must continue to rely on juries, not appellate courts, to decide difficult factual issues such as fault allocation and determining general damages. In this case, the jury had a superior role in assessing credibility and evaluating evidence firsthand. Because the record amply and reasonably supports the jury's factual findings as to both fault allocation and damages, I think the majority has impermissibly usurped the jury's role in this case.